**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)**

RICHARD I. FRIED,

        Plaintiff,

vs.                                 Civil Action No. _____

STIEFEL LABORATORIES, INC., a
Delaware corporation, CHARLES W.
STIEFEL, BRENT D. STIEFEL, TODD
STIEFEL, STEPHEN KARASICK,
MICHAEL CORNELIUS, MATT S. PATTULLO
 and ANJAN MUKHERJEE,

        Defendants.

_____/

## COMPLAINT

Plaintiff RICHARD I. FRIED ("Fried" or "Plaintiff") brings this action against STIEFEL

LABORATORIES, INC., a Delaware corporation, CHARLES W. STIEFEL, BRENT D.

STIEFEL, TODD STIEFEL, STEPHEN KARASICK, MICHAEL CORNELIUS, MATT S.

PATTULO, and ANJAN MUKHERJEE, and alleges:

1.    Plaintiff Fried brings this action in connection with his stock of Defendant Stiefel

Laboratories, Inc. (the "Company"), as part of its Employee Stock Ownership Plan and Trust (the

"Employee Plan") as well as stock owned by Plaintiff separate from the Employee Plan: (i) under

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101, *et seq*., for

damages under 29 U.S.C. §§ 1109 and 1132(a); (ii) under the Securities and Exchange Act of 1934

(the "Exchange Act"), 15 U.S.C §§ 78a-78kk, and Rule 10b-5 of the Securities and Exchange

Commission (the "SEC") and Sections 19(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j and

78t, for relief under the Exchange Act, and; (iii) for state law claims for breach of fiduciary duty; promissory estoppel, and common law fraud.

## JURISDICTION AND VENUE

2.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, 29 U.S.C. § 1132(e), and 15 U.S.C. § 78aa, and supplemental jurisdiction over Fried's state law claims pursuant to 28 U.S.C. §1367.

3.      This Court has personal jurisdiction pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(1) over the Defendants, all of whom reside in the United States. This Court also has personal jurisdiction pursuant to Rule 4(k)(1)(A), Fed.R.Civ.P., because all Defendants would be subject to the jurisdiction of a court of general jurisdiction in the State of Florida.

4.      Venue is proper in this Court pursuant to 29 U.S.C. §§ 1391 and 1132(e), Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because many of the acts complained of herein occurred in substantial part in the Southern District of Florida, the Employee Plan at material times was administered in the State of Florida, the alleged breaches of fiduciary and statutory duties, promissory estoppel, and other torts occurred in this District of the State of Florida, the headquarters and principal place of business of the Company was, at all material times, in Miami-Dade County, Florida, and several of the Defendants reside in the Southern District of Florida.

5.      In connection with the acts alleged in this lawsuit, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail to carry out the conduct in violation of applicable federal and state laws as set forth herein.

## THE PARTIES

6.      Plaintiff Fried is a resident of Alpharetta, Georgia.  For approximately ten years until he amicably left in 1997, Fried served as the Chief Financial Officer of the Company.  Fried worked at

the Company's headquarter offices in Coral Gables, Florida, while at the time residing in southern Florida.  At all material times, Fried was a participant in the Employee Plan and also owned stock of the Company independently thereof.

7.     The Company is a specialized pharmaceutical company that focuses on development and sale of dermatological and skin care products.  Formed in Germany in 1847 by John D. Stiefel, it was, at relevant times, the world's largest independent pharmaceutical company specializing in dermatology. At material times it had annual sales of roughly one billion dollars and approximately 4,000 employees.  While previously incorporated in New York, the Company is presently a Delaware corporation.  At all times relevant to the claims set forth in this Complaint, the Company maintained its principal place of business in Coral Gables, Miami-Dade County, Florida.

8.     Defendant Charles W. Stiefel ("Charles Stiefel"), is a resident of Raleigh, North Carolina. At relevant times, he resided in Miami, Florida. Charles Stiefel was a fiduciary as that term is defined under ERISA and, on information and belief, the Employee Plan Trustee.

9.     At all relevant times Charles Stiefel served as Chairman of the Board of Directors, President and Chief Executive Officer of the Company. Charles Stiefel was actively involved in and exercised control over the day-to-day operations of the Company. On information and belief, Charles Stiefel at all relevant times owned and controlled, individually or through entities which he controlled or family members, more than 50% of the outstanding stock of the Company while at the same time personally owning over 50% of the outstanding stock entitled to vote. He was, at material times, able to elect a majority of the members of the Board of Directors.

10.    Defendant Brent D. Stiefel ("Brent Stiefel"), is presently a resident of Seattle, Washington, but at the material times was a resident of Key Biscayne, Miami-Dade County, Florida. At relevant times, Brent Stiefel was a fiduciary as that term is defined under ERISA, a member of the Company's

Board of Directors, was the Company's Executive Vice President of Corporate Development, and was actively involved in, and exercised control over the day-to-day operations of the Company. He was a shareholder of the Company at relevant times. Brent Stiefel is the son of Charles Stiefel.

11.     Defendant Todd Stiefel ("Todd Stiefel") is a resident of Research Triangle Park, North Carolina, but was a resident of Miami-Dade County, Florida, during the events recounted in this Complaint. He was a fiduciary as that term is defined under ERISA, a member of the Company's Board of Directors, the Company's Executive Vice President of Global Strategy and was actively involved in, and exercised control over, the day-to-day operations of the Company. He was at relevant times a shareholder of the Company. Todd Stiefel is the son of Charles Stiefel.

12.     Defendant Stephen Karasick ("Karasick") is a resident of Atlanta, Georgia. He was a fiduciary as that term is defined under ERISA, the Company's Senior Vice President of People & Technology and was actively involved in, and exercised control over, the day-to-day operations of the Company. He became the Trustee of the Employee Plan on or about October 20, 2008. At material times Karasick served on the Committee of the Employee Plan.

13.     Defendant Michael Cornelius ("Cornelius") is a resident of Miami-Dade County, Florida. He was a fiduciary as that term is defined under ERISA, the Company's Vice President and Chief Financial Officer and was actively involved in, and exercised control over, the day-to-day operations of the Company at all material times.  At material times, Cornelius served on the Committee of the Employee Plan.

14.     Defendant Anjan Mukherjee ("Mukherjee") is, on information and belief, a resident of New York City, New York. At relevant times he was a fiduciary as that term is defined under ERISA, and was a member of the Company's Board of Directors beginning approximately August 2008. In that capacity he was actively involved in, and exercised control over, the day-to-day operations of the

Company at all material times. Mukherjee was and is affiliated with Blackstone Group and was designated by its affiliate, Blackstone Healthcare Partners, LP,[1]  to be a member of the Company's Board of Directors. Blackstone Healthcare Partners, LP was a shareholder of the Company beginning in August 2007.

15.    Defendant Matt S. Pattullo ("Pattullo"), is a resident of Miami-Dade County, Florida. At relevant times, he was the Company's corporate secretary, Senior Vice President of Global Corporate Administration and Vice President of Human Resources. At relevant times, he was actively involved in, and exercised control over the day-to-day operations of the Employee Plan and held himself out as the Plan Administrator.  He was a fiduciary of the Employee Plan as that term is defined under ERISA.

16.    Upon information and belief, at all relevant times the Defendants Todd Stiefel, Brent Stiefel, and Pattullo, in addition to Charles Stiefel, were owners of shares of stock issued by the Company ("Company Stock") separate and apart from the Employee Plan.

17.    Defendants Charles Stiefel, Pattullo, Karasick and Cornelius, are persons who, in addition to the other roles they are alleged to have undertaken on behalf of the Employee Plan and the Company, formed the "Committee" ("Committee Defendants") under the Employee Plan as described herein at all relevant times. They were appointed by the Company's Board of Directors. Upon information and belief, three or four of these individuals served on the Committee at relevant times.  Each of the Committee Defendants was a fiduciary as that term is defined under ERISA.

18.    Defendants Charles Stiefel, Brent Stiefel, Todd Stiefel, and Mukherjee are referred to collectively as the "Director Defendants."  Charles Stiefel, Brent Stiefel, and Todd Stiefel are

---

[1] The Blackstone Group and its affiliates, including but not limited to Blackstone Healthcare Partners, LP, will hereafter be collectively referred to as "Blackstone."

referred to collectively as the "Stiefel Defendants." Defendants Charles Stiefel, Pattullo, Karasick and Cornelius are referred to collectively as the "Fiduciary Defendants."

19.     The Director Defendants were senior executive officers and directors of the Company, and were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, present and future strategic business plans and prospects, and matters impacting the fair market value of the Company. At relevant times, the Director Defendants had access to material information not otherwise available to other shareholders, Fried, employees and Employee Plan participants (other than themselves) concerning the Company. Because of their positions with the Company, the Director Defendants had access to such information about its business, finances, financial condition, present and future strategic business plans and prospects, and fair market value via access to internal corporate documents, conversations and connections with other corporate officers and directors, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith, all of which was not made known to Fried, other Employee Plan participants and other shareholders.

20.     The Director Defendants, Committee Defendants and Fiduciary Defendants, because of their positions with the Company and as fiduciaries of the Employee Plan, controlled and/or possessed the authority to control the information provided to Fried and to the person who performed the annual valuation of the Company Stock in connection with the Employee Plan. The Director Defendants were aware, or should have been aware, of the misrepresentations and omissions described herein that were made to Fried at, prior to, or shortly after such misrepresentations or omissions, and had the ability and opportunity to prevent such misrepresentations or omissions or cause them to be corrected.

21.     The Stiefel Defendants, and particularly Charles Stiefel as well as Karasick, because of their positions with the Company and roles as Committee members and as Trustee of the Employee Plan, controlled and/or possessed the authority to control the information provided to Fried and to the person who performed the annual valuation of the Company Stock in connection with the Employee Plan. The Stiefel Defendants were aware, or should have been aware, of the misrepresentations and omissions described below that were made to Fried, prior to, or shortly after, such misrepresentations or omissions were made, and had the ability and opportunity to prevent such misrepresentations or omissions or cause them to be corrected.

22.     Upon information and belief, prior to April 2009, a large majority of the issued and outstanding shares of Company Stock was owned by the Stiefel Defendants and those who are members of the families of Charles Stiefel, Herbert Stiefel (Charlesø uncle) and Werner Stiefel (Charlesø father).

### THE EMPLOYEE STOCK BONUS PLAN AND ITS VALUATION

23.     The Employee Plan was established effective April 16, 1975. Between that date and December 31, 2008, the Company made contributions of cash and/or Company Stock to the Employee Plan. The Employee Plan is voluminous. Relevant parts of the Employee Plan that, on information and belief, were in effect in 2008-09 are attached as **Exhibit A**. On further information and belief, the relevant parts of the Employee Plan that are attached are similar to those of previous versions.

24.     The Employee Plan is governed by ERISA, § 2 *et seq.,* 29 U.S.C. § 1101 *et seq.*, and the Employee Plan documents.

25.     United States resident employees, following their first eligibility year (a year with a minimum of 1,000 hours of service) were participants in the Employee Plan. **Exhibit A**, Employee Plan ¶ 3.

26.     The Employee Plan was set up to allow Company employees to share in the growth of the Company that they had helped to create, and to be a qualified stock bonus plan under §§ 401(a) and 409 of the Internal Revenue Code (the "Code").

27.     The plan documents set forth the management of the Employee Plan, the allocation of shares of Company Stock, and the Trustees', Committee's and Plan Administrator's responsibilities.

28.     The Employee Plan is controlled and managed by, (i) a "Committee" consisting of at least three persons selected by the Company's directors; (ii) a Trustee selected by the Company's directors; and (iii) a Plan Administrator. The Employee Plan provides:

> "The exclusive responsibility and authority to control and manage the operation and administration of the Employee Plan, except to the extent such responsibility and authority are otherwise specifically (i) allocated to the Company or the Trustee, (ii) delegated to other persons by the Committee or (iii) allocated to other parties by operation of law, shall be vested in the Committee."

Exhibit A, Employee Plan ¶ 9.1.

29.     The Employee Plan provides that, "The Trustee *shall* determine in its best judgment the fair market value of the [Employee Plan] Stock from time to time as may be necessary for any purpose under the Plan,...." Employee Plan ¶ 9.7.  (Emphasis added.)

30.     The Employee Plan provides that, "[e]ach member of the Committee shall discharge his powers and authority under the Employee Plan in good faith and in accordance with the applicable requirements of ERISA." **Exhibit A**, Employee Plan ¶ 9.9.

31.     The Trust Agreement between the Company and Charles Stiefel dated March 22, 2002 (the "Trust Agreement") provides, among other things that, "All purchases and sales of ESOP Stock

and/or Bonus Stock shall be made by the Trustee at fair market value as determined by the Trustee in good faith *and* in accordance with any applicable requirement under ERISA.ö (emphasis added). A copy of relevant parts of the Trust Agreement between the Company and Charles Stiefel, and Karasickøs Appointment and Acceptance of Successor Trustee, is attached as **Exhibit B.**

32. At relevant times, Charles Stiefel was the Trustee of the Employee Plan and Pattullo undertook duties of the Plan Administrator. Karasick became Trustee of the Employee Plan on or about October 20, 2008, and remained Trustee at all relevant times thereafter.

33. ERISA imposes duties upon the people and entities that are responsible for the operation of the Employee Plan. The corporate entity and individuals who operate the Employee Plan, called "fiduciaries" of the Employee Plan, have a duty to do so prudently and for the best interests of the Employee Plan participants and beneficiaries.

34. The Director Defendants, Committee Defendants, Charles Stiefel, Karasick and Pattullo were fiduciaries with respect to the Employee Plan because they had discretionary authority and/or control over the management of the Employee Plan. This discretionary authority and/or control included, without limitation, the authority to name and retain the Employee Plan's Trustee, Committee members, and the Plan Administrator. The Director Defendants exercised this authority by naming Charles Stiefel and later Karasick as the Trustee, and naming the individuals who would serve on the Committee at any given time. They exercised discretion, authority and/or discretionary control respecting the management, administration and/or disposition of assets of the Employee Plan [i.e. the Company Stock held by the Employee Plan].

35. The Committee and the Director Defendants, Charles Stiefel and Karasick exercised discretionary authority respecting the Employee Plan's management and administration in making

representations, misrepresentations and omissions to Fried and other Employee Plan participants regarding, among other things, the fair market value of the Company Stock.

36.     Participants' interests in the Employee Plan shares increased in number and value over their years of service and became vested according to the Employee Plan schedule.

37.     Until a time not material to this Complaint, Fried and other participants in the Employee Plan could not sell, trade, redeem or otherwise dispose of the shares in their accounts unless separated from the Company by retirement, death, termination or other separation, and then had the right to obtain distribution of their shares on conditions contained in the Employee Plan. **Exhibit A**, Employee Plan, Section 7.[2]

38.     Upon distribution of the shares to a participant after separation from service, the participant had the right to "put," *i.e.,* sell, the shares to the Company in accordance with the provisions of ¶ 7.6 of the Plan, as required for qualification of the Plan under Section 401(a) and 409(h) of the Code.  That is, the separating Employee Plan participant had the legal right to demand that the Company purchase his or her distributed shares, and the Company had the legal duty to buy them during the 60 day period after the distribution of the shares to the participant and during another 60 day period during the following Employee Plan year. **Exhibit A**, Employee Plan ¶ 7.6. The Employee Plan participants who separated from the Company also had the options to either not take a distribution or to take a distribution and not sell their shares to the Company and instead remain stockholders of the Company.

39.     ERISA requires a good faith valuation of the fair market value of the Company's Stock in the Employee Plan to be performed in good faith and based on all relevant factors for determining the fair market value of the securities.

---

[2] Except in limited circumstances not applicable to this Complaint.

40.     In order to qualify as a good faith valuation, the fair market value must be based on appraisals conducted *at least* annually. The appraisal must be conducted by a person who customarily makes such appraisals *and* who is independent of any party.  26 CFR § 170A-11(d)(5).

41.     Under the Employee Plan, the Trustee had a duty to appoint an independent appraiser competent to perform valuations of the Company Stock and who met the requirements of § 170(a)(1) of the Code.  Employee Plan, ¶ 9.7; Trust Agreement, ¶ 2.1.  In this regard, the Trustee for the Employee Plan, Charles Stiefel, designated Terrence N. Bogush, CPA ("Bogush"), a certified public accountant in Poughkeepsie, New York to provide the valuation appraisals of Company Stock for the Employee Plan. These valuations were also used by the Company in stock transactions not involving the Employee Plan.

42.     Since the mid-1980s Bogush, individually and through the firms to which he belonged, has been the sole provider of valuations of the fair market value of the Company Stock in connection with the Employee Plan. Bogush did not customarily make such appraisals to determine fair market value of corporate stock and was not independent since he did not perform a majority of his appraisals during any year for persons or entities other than the Company.

43.     In August 2007, Blackstone made an equity investment of $500 million in a new class of preferred stock of the Company (the "Blackstone Investment").  Under terms not disclosed to Fried and unknown to him at the relevant times, the Company issued over 8,000 shares of Preferred Series A stock in connection with the Blackstone Investment at $60,000 per share, convertible to common stock at a 1:1 ratio.  The Blackstone Investment is described in further detail below.

44.     Documents constituting or relating to the determination of the valuation and investment share price of the Company Stock in connection with the Blackstone Investment were made available to the Director Defendants.

45.     Valuations of the Company Stock were prepared by Bogush to purportedly reflect the fair market value as of March 31st of each year.  For March 31, 2007, this valuation was established by Bogush at $14,517 per share (the "2007 Valuation").   For March 31, 2008, the valuation was established by Bogush at $16,469 per share (the "2008 Valuation").[3]

46.     The 2007 Valuation and the 2008 Valuation both grossly undervalued the fair market value of the Company's common stock.

47.     Defendants based the annual valuation of the Company Stock directly upon the Bogush Valuations that they knew were invalid and undervalued. Starting in 2003, a number of independent third party valuations of the Company took place in connection with various financial transactions involving the Company.  On information and belief, all of them resulted in valuations greatly higher than the Bogush Valuations.  That the Bogush Valuations were grossly undervalued is also shown by independent valuations done in connection with the processes resulting in the Company's acquisition of Connetics Corp. in December 2006, the Blackstone Investment in August 2007, and in the purchase of the Company by GlaxoSmithKline ("Glaxo")(the "Glaxo Sale") under contract in April 2009 with closing in July 2009.  On information and belief, although each of the Director Defendants knew of one or more of these independent valuations, they failed to disclose them to Fried, other Employee Plan participants or other shareholders.

48.     The Bogush Valuations were also used by Defendants in connection with the Company's purchase of Company Stock apart from the Employee Plan as representations of the fair market value of the Company Stock for all purposes.

---

[3] The 2007 Valuation and/or 2008 Valuation may be individually or collectively referred to as "Bogush Valuation(s)".

## THE STOCK SALES

49.     Throughout its 160-year history the Company has been a privately held corporation.  A majority of its shares have been and, until the purchase by Glaxo described herein, were owned by Stiefel family members or entities in their control.

50.     The Company and the Stiefel family members have, until the events described herein, steadfastly asserted to the public, to their employees, Employee Plan participants and other shareholders that the Company was not for sale and would remain independent. Specifically, the Company consistently told Fried and other Employee Plan participants, directly and through news releases, that the Company would remain privately held.  For example:

   a.   On March 8, 2007, in a Miami Herald Article the Company's President, Charles Stiefel stated, "[t]he family has no plans to go public...There are so many advantages to being private;"

   b.   On August 10, 2007, the Company announced in a Miami Herald article that it would receive a $500 million infusion from Blackstone. The Company "stressed that the company will remain a family-controlled business..." and denied rumors of a corporate restructuring by explaining that although, "Blackstone, like most private equity firms, often plots an exit strategy through a public offering of stock – [it is] something that Stiefel has said in the past the company has no interest in," and;

   c.   After the $500 million infusion from the Blackstone into the Company, in August 2007, the Company and Charles Stiefel reiterated their mantra that the Company was independent and not for sale.

51.     Indeed, the Stiefel Defendants and the Company historically asserted, privately to Fried and in various news releases and other communications to employees and third parties, that the Stiefel family would not sell the Company or take it public. It was well known to Fried and among Employee Plan participants that there was no publicly traded market for the Company Stock and the stock paid no dividends.

52.     In August 2007, the Company entered into the agreement with Blackstone for a $500 million investment in a then newly-issued class of non-voting preferred stock, designated as Preferred Series A, convertible at the option of Blackstone to non-voting Common Stock Series C at a 1:1 ratio. Although the total amount of the Blackstone Investment was made public, the fact of the Blackstone Investment as directly evidencing an equivalent price for common stock of $60,000 per share was neither publicized nor made available to Fried or other Employee Plan participants.

53.     Blackstone is a private equity/investment banking/merger and acquisition group whose *modus operandi* is to profit by "taking public" or selling the companies in which it invests. On information and belief, it became the ultimate strategic objective of the Director Defendants and Stiefel Defendants to work with Blackstone and sell the Company starting at the time of the 2007 agreement with Blackstone. The Director Defendants and the Stiefel Defendants, and specifically Defendant Charles Stiefel, never expressly or implicitly disclosed such an intention in any communication with Fried and represented the opposite to him at all times.

54.     As of December 31, 2008, the following shares of Company stock were authorized, issued and outstanding:

        a. Preferred Stock Series A – 8,277 shares (held by Blackstone); and

        b. Common Stock Classes A, B, and C[4] – 32,812 shares.

---

[4] The difference between Common Stock Classes A, B and C relates to voting rights. There is no difference in value between the shares.

55.     No later than October or November 2008, the Stiefel Defendants and Mukherjee began to discuss the possible sale of the Company with potential acquirers.

56.     On or about November 26, 2008, after consultation with Defendant Mukherjee, Defendants Charles Stiefel, Todd Stiefel and Brent Stiefel decided to start the process for the sale of the Company.  They began discussing the sale price among themselves and with Mukherjee, putting the price Blackstone paid ($60,000 per share) as a floor.

57.     On December 8, 2008, Defendant Mukherjee informed Charles Stiefel that he believed that $3 *billion* was an enterprise value, and that would net cash to shareholders of $2.6 *billion*. These values exceeded the $60,000 per share paid by Blackstone the previous year.

58.     Beginning on or about December 10, 2008, Charles Stiefel, Brent Stiefel and Todd Stiefel began to negotiate a contract with Blackstone Advisory Services to provide services in connection with the solicitation of interest in purchasing of the Company. The contract was concluded and signed on or about December 30, 2008.

59.     On December 22, 2008 Charles Stiefel met in New York City, New York with the chief executive officer of a then-potential acquirer, along with a senior managing director of Blackstone, Defendant Mukherjee, and a representative of the potential acquirer's investment banking firm, to discuss the sale of the Company.

### <u>Notice of the GlaxoSmithKline Sale</u>

60.     On April 24, 2009, the Company notified its shareholders of record that it had entered into a written merger agreement with Glaxo. According to the Information Statement document furnished to shareholders on or about that date:

a. In January 2009, discussions for the acquisition of the Company had progressed to the point where five companies had indicated an interest in acquiring the Company through Blackstone, its investment banker;

b. During February 2009, the Company's management met with management teams of four of the five parties who were interested in acquiring the Company. On February 26, 2009, representatives of Glaxo attended a presentation by the Company's management;

c. Glaxo is a public company incorporated under the laws of Great Britain. It has headquarters in London and U.S. headquarters in Research Triangle Park, North Carolina. It has operations in some 140 countries and products sold in over 150 countries;

d. On March 20, 2009, the Wall Street Journal reported that the Company was considering selling itself, and mentioned three potential acquirers, including Glaxo, and an estimated sale price in the range of $3 billion to $4 billion;

e. On March 24, 2009, Glaxo and another party submitted bids to acquire the Company. Those parties continued their due diligence through mid-April 2009. Drafts of proposed merger agreements were thereafter exchanged;

f. During the period April 17-19, 2009, the Company's management met with Glaxo's representatives to negotiate the final terms of a Merger Agreement; and

g. On April 19, 2009, the Company's Board of Directors met, discussed and approved the Merger Agreement with Glaxo. The Merger Agreement was signed on April 20, 2009.

61.     The Company, Director Defendants, Committee Defendants and Pattullo failed to impose a blackout period on the purchase of Employee Plan Stock by the Company until such time as they disclosed the existence of plans or efforts for the sale of the Company.

62.     The Glaxo sale closed and all of the Company Stock was sold on or about July 20, 2009.

### Defendants Manipulate Fried's Sales of Stock

63.     Plaintiff Fried, prior to the events described above in this Complaint, was an employee of the Company and served for several years as its Chief Financial Officer before leaving the Company amicably in 1997.

64.      During his time as a Company employee, Fried was entitled to participate and did participate in the Employee Plan.  Under the Employee Plan, Fried acquired ownership or beneficial interest in Company Stock eventually amounting to 30.7881 shares

65.     Fried also acquired another 10 shares of the Company separate and apart from the Employee Plan during his period of employment with the Company.  As of late summer 2007, Fried's total ownership of shares of the Company totaled 40.7881 shares, being 10 shares in his own name and 30.7881 shares in his account in the Employee Plan.

66.     As Chief Financial Officer of the Company, Fried worked directly and closely with many directors and officers of the Company and, in particular, Charles Stiefel.

67.     Over the years of his employment, Fried and Charles Stiefel developed both a professional and close personal relationship.  They regularly met at dinners, sporting and social events outside the Company.

68.     During his employment at the Company, Fried placed trust and confidence in Charles Stiefel not only about issues relating to the immediate operation of the Company, but also regarding

personal matters and consulted on topics such as career aspirations and decisions, personal financial issues and investment decisions, the long-term prospects and direction for the Company, and Fried's shares of Company Stock.

69.     After leaving the Company, Fried continued to have conversations and meetings with Charles Stiefel periodically through 2009.  The meetings occurred when Fried returned to South Florida for personal reasons or for Company shareholder meetings.  Some topics repeatedly brought up and discussed at the meetings with Charles Stiefel over the years were Fried's shares of stock in the Company, the Company's prospects, and valuations of the Company and the Company Stock. Fried regularly requested Charles Stiefel's counsel and direction regarding management of his shares of Company Stock, both those in the Employee Plan and those held separately, and whether they should be sold or continue to be held.  Charles Stiefel accepted the requests and provided Fried with his assessment of the prospects for the Company, its financial status, opportunities and threats for the Company, general indication on any changes in the valuation of the stock, and his advice on whether Fried should hold or sell his shares of stock in the Company.

70.     Fried also requested and obtained advice on the handling of his stock from officers of the Company other than Charles Stiefel, including Defendant Pattullo.

71.     In 2005, Fried consulted with Pattullo regarding his Company Stock, held both in the Employee Plan and separately.  Based on a recommendation from Pattullo, Fried then decided against a distribution or sale of his shares.

72.     In the summer of 2007, the Company announced the Blackstone Investment and set a shareholders' meeting for September 17, 2007, in Coral Gables, Florida.  Fried and Charles Stiefel set up a meeting for the day of the shareholders' meeting.

73.     In advance of the shareholders' meeting, Fried and Charles Stiefel discussed that Fried wanted to get Charles Stiefel's projections for the valuation of the Company Stock as part of deciding whether to keep all of his non-Employee Plan shares of Company Stock.

74.     Charles Stiefel met privately with Fried on September 17, 2007.  Charles Stiefel provided his advice and counsel concerning the valuation of the Company Stock and, in particular, what impact the Blackstone Investment would have on the next Bogush Valuation.

75.     At the meeting with Fried, Charles Stiefel did not disclose or discuss the terms of the Blackstone Investment, nor did he otherwise make the terms of the Blackstone Investment known to Fried, even though Charles Stiefel was well aware of the terms at the time of the discussion. Charles Stiefel intentionally and misleadingly represented to Fried that even though the number of Series A preferred shares issued to Blackstone was based upon a valuation of the Company Stock at $60,000 per share, this price did not indicate that the Bogush Valuations were in any way incorrect or understated.  Charles Stiefel explained this was because of certain terms of the Blackstone Investment that he would not disclose.  Nor did he disclose the fact that the preferred shares were convertible to common shares at a 1:1 ratio.  Instead, Charles Stiefel further informed Fried that the March 31, 2008 Valuation would not be affected by the price and terms of the Blackstone Investment even before the 2008 Valuation had been started by Mr. Bogush.

76.     In reality, the Blackstone Investment shows that both the 2007 Valuation of $14,517 per share and the 2008 Valuation at $16,469 per share were grossly understated.  Charles Stiefel and other Director Defendants knew at all relevant times that the Blackstone Investment was convertible to common stock at a 1:1 ratio, thus meaning that the valuation of $60,000 per share of Company common stock was approximately correct.  The Company and Fiduciary Defendants failed to take

appropriate measures to ensure that the Bogush Valuations were corrected or accurately reflected the Blackstone Investment.

77.     Neither Charles Stiefel nor any of the other Defendants disclosed to Fried that the Blackstone Investment showed that the Bogush Valuations were erroneous and could not be relied upon to provide an accurate, good faith fair market value of the Company Stock.  Nor did the any of the Defendants disclose to Fried that other valuations prepared within several months of the Blackstone Investment showed a much higher valuation of the Company Stock than that stated in the Bogush Valuations.

78.     Fried reasonably relied on the advice and representations of Charles Stiefel regarding the valuation of the Company Stock and sold his 10 non-Employee Plan shares to the Company on or about March 6, 2008 at the price of $14,517 per share less a discount.  The Company based this price per share on the Bogush Valuation issued for March 31, 2007.   No upward adjustment to the share price was made despite consummation of the Blackstone Investment before the 2007 Valuation was completed.  To add insult to injury, the Company took an additional 10% reduction in the price of Fried's shares, as was the usual Company practice for such non-Employee Plan transactions.  Thus after the 10% reduction, the net amount of sale proceeds distributed to Fried was $13,065 per share, even though just a few months earlier Blackstone had paid the equivalent of $60,000 per share for Company Stock.

79.     On or about October 3, 2008, Fried and Charles Stiefel met once again for Fried to gain Charles Stiefel's counsel on the prospects for the Company, the valuation of the Company Stock, and the status of Fried's shares in the Employee Plan (the "October 2008 meeting").

80.     At the October 2008 meeting, Charles Stiefel advised Fried that in view of recent turmoil in the U.S. and world economy, the Company's short and mid-term prospects were

worrisome, that the next few years would be very challenging, that the Company's net income would likely drop, with the result that the valuation for March 31, 2009 and the following few years would likely be lower than the 2008 Valuation. Charles Stiefel failed to disclose to Fried any intent or plans to sell the Company, or the valuations of the Company he had received as part of the Blackstone Investment and in connection with the Connetics acquisition in December 2006, or any facts showing that there was a basis for Fried to believe that the then-pending 2008 Bogush Valuation would inaccurately reflect the fair market value of the Company Stock.

81. In December 2008, based upon Charles Stiefel's advice, information and representations, Fried decided to obtain distribution of his shares of the Company from the Employee Plan with a view to "putting" them back to the Company so as to have the 2008 Valuation apply rather than risk a decrease in the valuation in 2009 or afterwards.

82. Unknown to Fried, by November 2008, Charles Stiefel, the Stiefel Defendants and the Director Defendants had already decided to move forward with the sale of the Company. In early December 2008, Defendant Mukherjee, who had been designated as a Company director by Blackstone, advised the Stiefel Defendants that the Company had an enterprise value in excess of $3 billion.

83. On December 16, 2008, Fried sent an email to Charles Stiefel requesting that they meet in South Florida before the end of the year in order to discuss financial developments of the Company since their October 2008 meeting. Fried advised Charles Stiefel that he had contacted the Company to initiate a distribution of his Company Stock from the Employee Plan.

84. Charles Stiefel responded the next day, December 17, 2008, and acknowledged that he received Fried's email but that he and his wife would be out of town at the time of Fried's visit to South Florida. Charles Stiefel intentionally failed to disclose the decision and efforts to sell the

Company, a valuation placing the share price at over $60,000 per share, or even suggest that it would not be prudent for Fried to take a stock distribution from the Employee Plan and "put" his shares back to the Company. Further, Charles Stiefel did not disclose that he was going to meet with the chief executive officer of a potential buyer of the Company and had begun negotiations to retain Blackstone's Mergers and Acquisition division to assist in marketing the Company.

85.     On or about December 22, 2008, a few days after the email exchange with Fried and without advising Fried about the nature of the meeting, Charles Stiefel met in New York City with the chief executive of a potential acquirer to discuss the sale of the Company.

86.     In late December 2008, without receiving any further communication from Charles Stiefel, or any of the other Defendants disclosing the decision and efforts to sell the Company or otherwise showing any basis for not relying upon information given him by Defendants, including Charles Stiefel's information and advice at the October 2008 meeting, Fried requested the distribution of his shares in the Employee Plan.

87.     Under cover of letter from Defendant Pattullo dated December 29, 2008, the Company distributed the Company Stock to Fried's IRA account.  Defendant Pattullo's letter stated that Fried, as provided in the Employee Plan, had the option during either of two 60-day periods thereafter to sell the shares back to the Company.  The Company used the 2008 Valuation of $16,469 per share to value the total payment at $507,222.61. Pattullo explained that the sale proceeds would be paid 20% in cash with the balance paid as a loan under a promissory note bearing interest at a 7.25% annual rate which would be paid off equally over four annual payments.  Fried further believed that this high rate of interest was an indication of the Company's deteriorating financial condition, which hastened his decision to put his shares to the Company.   Fried also had the option under the Employee Plan of retaining the shares indefinitely.

88.     The Company, and Fiduciary Defendants used and applied the Bogush Valuations to transactions, including those with Fried at issue in this action, when they knew or should have known in good faith that the Bogush Valuations did not reflect the true fair market value of the Company Stock.

89.     On January 6, 2009, Fried submitted the order for his shares to be "put" to the Company under the terms of the Employee Plan and the December 29, 2009 letter from Defendant Pattullo.

90.     In submitting his "put" order on January 6, 2009, Fried reasonably relied on the information and representations given him by the Company and the  Defendants, or omitted by them, because he had not received any indication or notice from Charles Stiefel, Pattullo or any other Defendant that representations and information provided to him, or omitted, were in any way materially false, misleading, inaccurate, incomplete or unreliable, and it having been represented to Fried in writing that interest would be paid at a 7.25% annual rate on the Company's promissory note.

91.     Under cover of letter dated January 30, 2009, the Company sent to Fried's IRA account administrator a check in payment of the cash portion of the sale plus a promissory note.  While the check was made out in the amount stated in the December 29, 2008 letter from Pattullo, and the promissory note bore the correct principal amount, the promissory note stated incorrectly that interest was payable at the annual rate of 3.25% and not the 7.25% rate represented to Fried in the December 29, 2008 letter from Defendant Pattullo.

92.     Fried thereafter informed Charles Stiefel of the discrepancy in the interest rate.  Even though Fried pointed out the incorrect and substantially lower promissory note interest rate to

Charles Stiefel, neither he nor the Company took any material steps to correct the interest rate or to otherwise compensate Fried for the difference

93.     Neither Charles Stiefel, Pattullo, Karasick, the Company nor any other Defendant communicated to Fried during December 2008 or January 2009 that they had decided to sell the Company, that there were serious and significant efforts underway to sell the Company, that potential purchasers had entered into discussions about purchasing the Company or that Blackstone had entered into a contract to advise the Company on its sale.  During this time, Charles Stiefel never communicated with Fried to contradict or correct the information, advice and counsel he gave in the October 2008 meeting.  If any of this information had been made known to Fried, even simply the fact of the Company having been put up for potential sale to interested parties, Fried would have either not taken a distribution or would not have decided to put his shares to the Company when he did.

94.     Fried first discovered that the Company was for sale by way of a March 20, 2009 article in the Wall Street Journal reporting that the Company was selling itself, mentioning three potential acquirers including Glaxo, and reporting an estimated sale price in the range of $3 billion to $4 billion.  Fried was stunned by what had developed since he spoke with Charles Stiefel at the October 2008 meeting, and began considering his options regarding the put of his Employee Plan shares to the Company.

95.     On April 20, 2009, the Company formally announced the Glaxo Sale to shareholders and the public.  Fried then communicated to Charles Stiefel his distress regarding the sale to Glaxo because he had relied, to his detriment, upon the advice and information Charles Stiefel gave him in deciding to take a distribution and then put his Company Stock back to the Company.   Fried

communicated to Charles Stiefel that he wanted the loss he had suffered to be corrected. A closing of the Glaxo sale transaction was thereafter set for late July 2009.

96.     In the ensuing communications, Charles Stiefel set up a May 27, 2009 meeting with Fried and wrote to him, "Given our long friendship, I will endeavor to come up with something that will make you happy." One possibility raised by Charles Stiefel was that of reversing the sale of Fried's shares and rolling them back to his account in the Employee Plan.

97.     Charles Stiefel's communications amounted to an admission that he and the Company had wrongly failed to inform Fried of the efforts to sell the Company, that Fried had been misled by Charles Stiefel's and the Company's silence, and that Fried must be compensated for a loss that Charles Stiefel expressly acknowledged.

98.     Charles Stiefel met with Fried as scheduled on May 27, 2009, but still had no sure remedy to compensate Fried. Charles Stiefel proposed three different ways to compensate Fried: "Plan A" in which Fried's "put" of his shares to the Company would be reversed, his shares rolled back to the Employee Plan from Fried's IRA account, the cash repaid and the Note surrendered; "Plan B" in which Charles Stiefel would sell 30.7781 shares of Company Stock to Fried at the price established by the 2008 Valuation, which would then be sold to Glaxo at the higher price; and "Plan C" by which Charles Stiefel suggested that Fried could sue for securities fraud in a "friendly lawsuit" that would be quickly and amicably settled, resulting in Fried being compensated for his loss.

99.     By July 2009, shortly before the closing of the Glaxo Sale, Charles Stiefel advised Fried that "Plan A" and "Plan B" would not be possible. Fried then mentioned the possibility of filing a "friendly lawsuit" as originally suggested by Charles Stiefel as "Plan C". However, Charles Stiefel implored Fried to not file a lawsuit as it could derail the closing of the Glaxo Sale. Charles

Stiefel promised instead to find a method to compensate Fried.  Fried relied upon Charles Stiefel's promise and decided to not file a lawsuit, believing instead that his friend and confidant, Charles Stiefel, would find an acceptable solution.

100.    Notwithstanding the above, Charles Stiefel never provided a way to compensate Fried for his loss, nor did Charles Stiefel make any substantial, good faith efforts to compensate Fried despite his repeated promises to do so.  Fried, relying on Charles Stiefel's promises, refrained from filing  a lawsuit and the Glaxo Sale closed on or about July 20, 2009.  On information and belief, Charles Stiefel and his family netted proceeds from the Glaxo Sale in excess of $1.6 *billion* with Charles Stiefel personally receiving approximately a quarter of a billion dollars.

101.    After the Glaxo Sale closed, Fried and Charles Stiefel had additional communications whereby Fried wanted to resume their earlier dialogue about Fried's damages.  Charles Stiefel informed Fried that he was no longer CEO of the Company or one of its directors, and could therefore be of no further assistance to Fried.  Charles Stiefel had thus succeeded in bringing the Glaxo Sale to closing, receiving payment of the sale proceeds, while thereby knowingly and intentionally depriving Fried of the actual value of his shares to the Defendants' benefit.

102.    On information and belief, the Company bought approximately 1,779 shares of Classes A, B and C of common stock during the period April 1, 2008-March 31, 2009.  Most of such purchases by the Company were Employee Plan Stock purchased at the 2008 Valuation of $16,469 per share even though the Defendants had knowledge that the 2008 Valuation was grossly understated and not made in good faith.  The result was that additional tens of millions of dollars were freed and distributed from the Glaxo Sale proceeds for the benefit of the Stiefel Defendants, Pattullo and Karasick.

103.    As of April 20, 2009, there were 32,812 shares of Company common stock outstanding and 8,930 shares of Series A Preferred stock outstanding. The price agreed by Glaxo in the Merger Agreement to purchase the outstanding Company Stock was to be paid out as $68,515.29 in cash for each share of common stock (all classes) and preferred stock with up to an additional $7,186.91 to be paid based on certain contingencies, for a total of $75,702.20 per share.

104.    These foregoing acts, misrepresentations and omissions were part of a scheme by the Company, the Stiefel Defendants, Fiduciary Defendants and Director Defendants to act in their self interest and that of Blackstone, to Fried's detriment.

### Attorneys' Fees

105.    Fried has retained the undersigned counsel and is obligated for a reasonable attorneys' fee.

### COUNT 1
### BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS, COMMITTEE DEFENDANTS, PATTULLO AND KARASICK
### (29 U.S.C. § 1104(a)(1)(A) and (B); ERISA Act § 404(a)(1)(A) and (B))

Fried incorporates the allegations of paragraphs 1 (as to ERISA claims), 2 (as to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. §1132(e)), 3, 4 (as to 29 U.S.C. §§ 1391 and 1132(e)), 5 through 69, 76, 77, 79 through 93, and 102 through 105 as if fully set forth herein.

106.    As set forth hereafter, "Fiduciary Defendants" or "Each Defendant" means Defendants other than the Company.

107.    The Employee Plan is an employee pension benefit plan under ERISA § 3(2), 29 U.S.C. § 1002(2), a defined contribution plan under 29 U.S.C. §1002(34), and an employee stock ownership plan under 29 U.S.C. § 1107(d)(6).

108.    The Employee Plan is subject to ERISA under ERISA § 4(a), 29 U.S.C. § 1003(a).

109.   Fried was a participant of the Employee Plan under ERISA § 502(a)(1)(b), (a)(1)(b) because he has a colorable claim to vested benefits.

110.   The Fiduciary Defendants are fiduciaries as defined under 29 U.S.C. § 1002(21) in that the Fiduciary Defendants exercised discretion, authority or discretionary control respecting the management of the Employee Plan or exercised authority or control respecting management or disposition of its assets.   The Fiduciary Defendants have discretionary authority or discretionary responsibility in the administration of the Employee Plan.

111.   As fiduciaries under ERISA, each Fiduciary Defendant was obligated to act solely in the best interests of the Employee Plan's participants including, specifically, Plaintiff Fried.

112.   The Fiduciary Defendants breached their duties to the participants of the Employee Plan, and Fried in particular, in that the Fiduciary Defendants failed to discharge their duties with respect to the Employee Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to the participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as more specifically set forth above. *See* 29 U.S.C. § 1104(a).

113.   The breach of fiduciary duties by the Fiduciary Defendants consists, among other things, of the failure to ensure that the shares of the Company owned by Fried and other participants under the Employee Plan were properly valued in good faith and at fair market value, in knowingly applying a valuation that the Fiduciary Defendants knew was erroneous and grossly understated to the "put" of Fried's shares distributed from the Employee Plan, and in intentionally misrepresenting or omitting to inform Fried that the Bogush Valuations were grossly understated when the Fiduciary Defendants knew or should have known that they were understated.

114.    Fried has been damaged as a direct and proximate result of each Fiduciary Defendants' breach of fiduciary duty to act solely in the interests, and for the exclusive benefit, of the participants and the Employee Plan including Plaintiff Fried.  Fried's damages include, but are not necessarily limited to, the difference in proceeds between the price actually applied by Fiduciary Defendants to his 30.7881 Employee Plan shares at $16,469 per share and the total compensation agreed to by Glaxo of $75,702.20, for a total principal amount of damages due Fried for this set of shares of at least $1,823.085.35, plus interest and attorney's fees as provided under ERISA.

115.    The Employee Plan does not provide an administrative remedy for claims such as those brought in this Count thus rendering any attempt by Fried to exhaust administrative remedies futile. The administrative review scheme of the Employee Plan is inapplicable to the claims herein. Pursuant to ¶ 9.7 of the Employee Plan, the Committee has no power to modify the share valuation as that power is delegated under the Employee Plan to the Trustee, who at relevant times was Charles Stiefel and later Karasick, and the Committee has no ability to direct the Trustee's actions. Further, the Employee Plan is administered by the same group of individuals that intentionally schemed to undervalue the Company Stock and personally benefited from this wrongful scheme.

116.    Fried is entitled to all available relief permitted under 29 U.S.C. §§ 1132(a) and 1109(a) including, but not limited to the following:

  a.   The recovery of benefits due Fried under the terms of the Employee Plan based upon the fair market value of his Company Stock interest accrued under the Employee Plan;

  b.   Attorneys' fees and costs as provided under ERISA 29 U.S.C § 1132(g)(1);

  c.   Prejudgment interest on all amounts; and

  d.   Such other and further relief as the Court deems appropriate.

WHEREFORE, Fried demands judgment against the Fiduciary Defendants, jointly and severally, for all relief set forth in paragraph 116.

## COUNT 2

### BREACH OF CO-FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS, COMMITTEE DEFENDANTS, PATTULLO AND KARASICK
### (29 U.S.C. § 1105(a); ERISA Act § 405(a))

Fried incorporates the allegations of paragraphs 1 (as to ERISA claims), 2 (as to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. §1132(e)), 3, 4 (as to 29 U.S.C. §§ 1391 and 1132(e)), 5 through 69, 76, 77, 79 through 93, and 102 through 115 as if fully set forth herein.

117.   As fiduciaries under ERISA, each Fiduciary Defendant was obligated to act solely in the best interests of the Employee Plan's participants and beneficiaries, including Fried, and are liable for the breaches of fiduciary responsibility of each of the other Fiduciary Defendants to the extent that they participated in the acts or omissions as specifically set forth herein, both by taking part in or concealing breaches of fiduciary duties by co-fiduciaries, by failing to comply with 29 USC § 1104(1)(1) and thereby enabling co-fiduciaries to commit a breach, or by knowing that acts or omissions of co-fiduciaries were breaches of fiduciary obligations without making efforts that were reasonable under the circumstances to remedy the breaches.

118.   As fiduciaries under ERISA, the Fiduciary Defendants are liable for the breaches of fiduciary responsibility of each of the other Fiduciary Defendants because they had knowledge of the acts or omissions as specifically set forth herein and made no reasonable efforts under the circumstances to remedy the breaches.

119.   As a direct and proximate cause of each Fiduciary Defendant's breach of fiduciary duty to act in the best interests of the Employee Plan participants and beneficiaries, Fried has been damaged by receiving less than fair market value for his 30.7881 shares of Employee Plan Stock.

Fried's damages include, but are not necessarily limited to, the difference in proceeds between the amount actually applied by Fiduciary Defendants to his 30.7881 Employee Plan shares at $16,469 per share and the total compensation agreed to by Glaxo of $75,702.20, for a total principal amount of damages due Fried for this set of shares of at least $1,823.085.35 plus interest and attorney's fees as provided under ERISA.

120.    The Employee Plan does not provide an administrative remedy for claims such as those brought in this Count thus rendering any attempt by Fried to exhaust administrative remedies futile. The adequate administrative remedy would consist in applying to the Committee to correct the Bogush valuations to the correct valuation amounts.   Pursuant, however, to section 9.7 of the Employee Plan the Committee has no power to modify the share valuation as that power is delegated under the Employee Plan to the Trustee and the Committee has no ability to direct the Trustee's actions.   Fried would be denied meaningful access to an administrative review scheme that is in place.   The Employee Plan is administered by the same group of individuals that intentionally schemed to undervalue the Company Stock, willfully made misrepresentations and omissions and advised and encouraged the uninformed Fried to sell his stock to the Company at artificially low prices, and personally benefited from this wrongful scheme.

121.    Fried is entitled to all available relief permitted under 29 U.S.C. §§ 1132(a) and 1109(a) including, but not limited to the following:

      a.    The recovery of benefits due to Fried under the terms of the Employee Plan based upon the fair market value of his Company Stock interest as accrued under the Employee Plan;

      b.    Attorneys' fees and costs as provided under 29 U.S.C. § 1132(g)(1);

      c.    Prejudgment interest on all amounts; and

    d.   Such other and further relief as the Court deems appropriate.

WHEREFORE, Fried demands judgment against the Fiduciary Defendants, jointly and severally, for all relief set forth in paragraph 121.

<u>**COUNT 3**</u>

<u>**SECURITIES FRAUD AGAINST THE COMPANY AND CHARLES STIEFEL**</u>
**[15 U.S.C. §§ 78j and 78t of the Securities and Exchange Act of 1934**
**(Sections 10(b), 19(b), 20(a) and Rule 10b-5)]**

Fried incorporates the allegations of paragraphs 1 (as to Exchange Act and Rule 10b-5 claims), 2 (as to 15 U.S.C. § 78aa), 3, 4 (as to Section 27 of the Exchange Act), 5-16, 18, 19, 22-26, 36-38, 42-93, and 102-105 as if fully set forth herein.

122.   The Company and Charles Stiefel each carried out a plan, scheme, and course of conduct which was intended to and did: (a) deceive Fried as to the fair market value of his Company Stock; (b) intentionally and artificially understate the valuation of Company Stock; and (c) cause Fried to sell his Company Stock, which he acquired both as part of the Employee Plan and separately thereof, to the Company at artificially low prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Company and Charles Stiefel took the actions set forth in this Count and incorporated herein by reference.

123.   The Company and Charles Stiefel each: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff Fried in an effort to maintain artificially low prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 and induce Fried to sell his Company Stock back to the Company.

124.    The Company and Charles Stiefel are sued as primary participants in the wrongful and illegal conduct.  Charles Stiefel is a Defendant as a person in control of the Company under Section 20(a) of the Exchange Act.

125.    The Company and Charles Stiefel, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal from Fried material information about the fair market value of the Company Stock as more specifically set forth above and plans and actions taken to sell the Company.

126.    The misrepresentations and omissions by the Company and Charles Stiefel to Fried regarding the Blackstone Investment was part of their campaign to reduce outstanding shares by inducing Fried and others to sell their shares to the Company using the 2007 and 2008 Valuations. By virtue of the Company's and Charles Stiefel's efforts, they were able to reduce the outstanding number of Company Stock and thereby increase the value of the remaining shareholders' Company Stock.

127.    Examples of misrepresentations and omissions of material information that the Company and Charles Stiefel made to Fried also include, without limitation, the following:

      a.    Knowingly and intentionally misrepresenting, or omitting material information to Fried in the September 2007 meeting with Charles Stiefel and afterwards regarding the nature and terms of the Blackstone Investment and its relation to the 2008 Valuation, when Charles Stiefel knew Fried would rely on his representations and information to decide to sell his 10 non-Employee Plan shares of Company Stock to the Company, and failing to correct the misrepresentations or omissions prior to the sale of those shares;

b.  Knowingly and intentionally misrepresenting to Fried in the October 2008 meeting with Charles Stiefel and at material times thereafter about expected performance and financial difficulties of the Company, omitting disclosure of plans for the Company's sale, omitting to fully disclose the price and terms of the Blackstone Investment, disclosing the terms of the Blackstone Investment in a manner that misled Fried into believing that the price paid was substantially less than $60,000 per share, omitting to correct earlier representations regarding the Blackstone Investment, and omitting to disclose steps taken or planned to sell the Company at any time prior to the conclusion of Fried's put of his Company Stock in the Employee Plan, while knowing that Fried would rely upon such information in deciding to "put" his Company Stock;

c.  The Company and Charles Stiefel furthered their plan or scheme to defraud Fried by intentionally failing in December 2008 and January 2009 to inform Fried of the plans to sell the Company and actions taken in furtherance thereof, even though they knew Fried was taking steps to "put" his Company Stock and that Fried was relying upon information Charles Stiefel and the Company had misrepresented to him as being accurate and complete;

d.  In written correspondence including, without limitation, written communications to Fried dated December 28, 2007 and December 29, 2008, at meetings as well as in the annual letters by Charles Stiefel, as Chairman, CEO and President of the Company (**Composite Exhibit C**):

(1) Misrepresenting that the Bogush Valuations provided a correct fair market value of the Company Stock owned by Fried, both as part of the

Employee Plan and separately, when in fact they grossly understated the fair market value;

(2) Concealing the accurate fair market value of the Employee Plan Stock in effect at the time;

(3) Failing to disclose that the purchase price of the shares did not represent the accurate fair market value of the shares of the Company Stock held by Fried in the Employee Plan as of the time of the letter(s);

(4) Misrepresenting the interest rate of the promissory note that would be applicable to the unpaid balance remaining upon the closing of the sale of Company Stock Fried held in the Employee Plan; and

(5) Concealing or omitting to disclose that a decision had been reached and steps taken to sell the Company for a share price in excess of $60,000 per share.

128.    The Company and Charles Stiefel acted in a reckless manner or with actual knowledge and intent that the statements referenced in this Count were false and misleading and that the failure to disclose material facts would affect the determination by Fried as to whether to ôputö or sell his shares of Company Stock distributed from the Employee Plan or owned separately by Fried back to the Company.  The Company and Charles Stiefel, with recklessness or with actual knowledge and intent, refrained from taking those steps necessary to discover whether the misrepresentations and omissions were false or misleading or to accordingly inform Fried once the inaccuracy of any such misrepresentation was discovered.

129.    In ignorance of the fact that the value of the securities was artificially depressed or that steps had been taken to sell the Company and reasonably relying directly or indirectly on the false

and misleading statements made by the Company and Charles Stiefel, or on the absence of material information that was known to these Defendants but was intentionally or recklessly disregarded by them, both Fried's Employee Plan Stock and his separately held Company Stock were sold in 2008 and 2009 to the Company at artificially low prices, thus increasing the Stiefel Defendants' and Pattullo's respective ownership percentages of the Company and the proceeds they would receive from the sale of the Company.  Plaintiff Fried was thereby damaged.

130.   At the time of the misrepresentations and omissions by the Company and Charles Stiefel, Plaintiff Fried reasonably relied upon and believed that these Defendants' statements were true. He was unaware of any omissions or inaccuracies, nor did he have a reasonable basis for believing such information to be incomplete or inaccurate. Had Fried known of the intentions, plans and efforts to sell the Company or of the correct fair market value of the Company Stock, including the effect of the Blackstone Investment and pending Glaxo Sale on the fair market value of the Company Stock, Fried would not have caused his shares of Company Stock to be sold to the Company or would not have done so at the artificially depressed valuations which he actually received.

131.   By virtue of the foregoing, the Company and Charles Stiefel have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

132.   The liability of Charles Stiefel as a control person under Section 20(a) of the Securities and Exchange Act arises from the following facts: (a) he was a high-level executive and director of the Company during all relevant times; (b) he was privy to and participated in the creation and development of the Company's internal budgets, plans, projections, and/or reports; (c) he was aware of the Company's dissemination of information to Fried which he knew was materially false and misleading; (d) he was Chief Executive Officer and/or President of the Company and had the

authority to direct the day-to-day operations of the Company; (e) he was involved and led or greatly influenced the decision to enter into the Blackstone Investment and the Merger Agreement as more specifically described herein; (f) he owned, personally and/or in combination with his immediate family, a controlling percentage of the outstanding classes of stock permitted to vote under the by-laws of the Company, and; (g) the percentage and value of the Company Stock owned by Charles Stiefel, his family and entities that he controlled, increased as a result of the repurchase of shares of Company Stock from Fried.

133.    As a direct and proximate result of the wrongful conduct of the Company and Charles Stiefel, Plaintiff Fried suffered damages in connection with both of his two sales of Company Stock and is entitled to recover jointly and severally against the Company and Charles Stiefel all available relief permitted under the Exchange Act including, but not limited to, the following:

a. Awarding compensatory damages in favor of Plaintiff Fried against the Company and Charles Stiefel, jointly and severally, for all damages sustained as a result of these Defendants' wrongdoing, in an amount to be proven at trial, plus applicable pre-judgment interest thereon at the legal rate;

b. Awarding Fried the reasonable costs and expenses incurred in this action, including attorney's fees in the maximum amount permitted;

c. Such other and further relief as the Court deems just and proper.

WHEREFORE, Fried demands judgment against the Company and Charles Stiefel for all relief set forth in paragraph 133 above.

## COUNT 4

## BREACH OF FIDUCIARY DUTY AGAINST
## CHARLES STIEFEL AND THE COMPANY
## (Florida Law)

Fried incorporates the allegations of paragraphs 1 (as to state law claim), 2 (as to supplemental jurisdiction pursuant to 28 U.S.C. § 1367), 3 (as to Rule 4(k)(1)(A), Fed.R.Civ.P.),  4 (as to breach of fiduciary duty claim), 5-16, 18-19, 22, 43-45, 48-87, 89-101, and 103-104 as if fully set forth herein.

134.    In his individual capacity and as director and chief executive officer of the Company, Charles Stiefel established a confidential relationship with Fried. This relationship developed through his pattern of conduct over several years and his close friendship with Fried. During the course of their relationship, Charles Stiefel willingly accepted and responded to Fried's requests for advice and direction in the management and sale of Fried's Company Stock, whereby Fried, with Charles Stiefel's knowledge and consent, placed trust and confidence in Charles Stiefel and his advice, information and representations regarding the Company, its plans and financial performance, and Fried's continued holding or sale of Company Stock.  Charles Stiefel accepted the trust Fried had placed in him by providing Fried with his advice and information regarding the Company, its operations, financial performance and plans and expectations for future performance, and whether Fried should hold or sell his Company Stock.  Charles Stiefel's fiduciary duty to shareholders stemming from his status as controlling shareholder and director is separate and apart from his fiduciary duty as a fiduciary of the Employee Plan.

135.    Charles Stiefel bore a fiduciary duty to Fried to act in utmost good faith and for Fried's benefit, both by virtue of establishing a relationship of trust and confidence with Fried as well as by virtue of his status as controlling or majority shareholder, director and chief executive officer of the Company, in contrast to Fried's status as minority shareholder who was not privy to the plans,

operations and documents of the Company.  Charles Stiefel was under a duty to guard the interests of Fried as beneficiary of his fiduciary duty, and to not make any profit or acquire any other personal benefit or advantage over Fried that was not also enjoyed by Fried.

136.    Fried, as an outsider and minority shareholder, was dependent upon Charles Stiefel as an accurate and timely source of information and advice regarding the Company and reasonably relied upon Charles Stiefel for such information and advice regarding the Company in connection with Fried's handling and retention or sale of his Company Stock held both in the Employee Plan and separately.

137.    Charles Stiefel breached his fiduciary duty to Fried when he intentionally or recklessly: a) misrepresented to Fried the value of the Company and the Company Stock in view of the Blackstone Investment and, later, the Glaxo Sale; b) misrepresented to Fried the prospects, expected financial performance and plans and intentions for the management of the Company; c) failed to disclose intentions, plans and efforts to sell the Company; d) failed or omitted to provide accurate advice or information to Fried upon learning or knowing that Fried was intending to sell his Company Stock whether such stock was distributed from the Employee Plan or which Fried owned separately thereof, and; e) manipulated and induced Fried to sell his Company Stock at prices known to Charles Stiefel to be grossly understated, all with the purpose to benefit  him, his family and the Company.

138.    Without any information or basis upon which to do otherwise, Fried reasonably relied on the information and advice given him by Charles Stiefel and sold all his Company Stock including stock distributed from his Employee Plan Account and held separately.  Charles Stiefel failed to communicate with or advise Fried appropriately even though he knew that Fried was selling his Company Stock to the Company in reliance upon the inaccurate, erroneous, incomplete

and misleading information and advice that Charles Stiefel had given, thus breaching his fiduciary duties.

139.    As a direct and proximate result of Charles Stiefel's multiple breaches of his fiduciary duties, Fried suffered injury when he sold his Company Stock at prices that Charles Stiefel and the Company knew or had reason to know were grossly understated with resulting damages to Fried. Charles Stiefel received personal gain from Fried's sale of Company Stock which resulted in fewer outstanding shares of Company Stock and correspondingly higher per share distribution of the proceeds of the Glaxo Sale.

140.    Plaintiff Fried is entitled to recover, jointly and severally, from Charles Stiefel and the Company, which is vicariously liable as Charles Stiefel's actions were on behalf of the Company as well as himself, a judgment as follows awarding Fried:

  a. Compensatory damages for all damages Fried sustained as a result of the Company and Charles Stiefel's wrongdoing in connection with Fried's sales of his Company Stock in an amount to be proven at trial, plus applicable pre-judgment interest thereon at the greatest legal rate; and

  b. The reasonable costs and expenses incurred in this action; and

  c. Punitive or exemplary damages in the greatest amount found by the jury for the Company's and Charles Stiefel's intentional or reckless breaches of fiduciary duty, and;

  d. All such other and further relief as the Court deems just and proper despite absence of an express request as set forth herein.

WHEREFORE, Fried demands judgment against the Company and Charles Stiefel, jointly and severally, for all relief set forth in this Count.

## COUNT 5

## PROMISSORY ESTOPPEL AGAINST THE COMPANY AND CHARLES STIEFEL
## (Florida law)

Fried incorporates the allegations of paragraphs 1 (as to state law claim), 2 (as to supplemental jurisdiction pursuant to 28 U.S.C. § 1367), 3 (as to Rule 4(k)(1)(A), Fed.R.Civ.P.),  4 (as to promissory estoppel claim), 5-16, 18-19, 43-87, 89-101, and 103-104 as if fully set forth herein.

141.   Charles Stiefel, speaking on behalf of himself and the Company, should have reasonably expected that his express request to Fried to forebear filing a civil action against the Company, coupled with the promise to find a method to compensate Fried, would induce Fried to forebear commencing a civil action. That was, in fact, Charles Stiefel's express purpose in imploring Fried as he did in his communications with Fried in July 2009.

142.   Fried did as Charles Stiefel expressly requested, and reasonably relied upon his promises of compensation to detrimentally forebear from commencing a civil action against the Company, Charles Stiefel, and other defendants when Fried had the right and ability to do so, thereby delaying his recovery of compensation and causing him to lose the use and benefit thereof, while simultaneously conferring a benefit on the Company and Charles Stiefel.

143.   Charles Stiefel and the Company, despite assurances to Fried to the contrary and despite Fried's forbearance from commencing legal action, have not provided Fried with a remedy or compensation for his loss in connection with the sale of his Company Stock even though Fried has demanded such compensation.  As such, Charles Stiefel and the Company have breached their promises to Fried.

144.   Both Charles Stiefel and the Company are barred by promissory estoppel from denying the existence of their promises and obligations to justly compensate Fried for his damages so as to thereby prevent injustice.

145.   The promises of Charles Stiefel and the Company must be enforced against them, jointly and severally, and Fried must be compensated in accordance with their promises and obligations.

146.   The application of promissory estoppel requires that:

a. The promises of Charles Stiefel and the Company be enforced against Charles Stiefel and the Company, jointly and severally, and that Fried be compensated in an amount to be proven at trial, in accordance with those promises, plus applicable pre-judgment interest thereon at the greatest legal rate;

b. That Fried be awarded his reasonable costs and expenses incurred in this action, including attorney's fees in the maximum amount permitted, and;

c. That Fried be granted all such other and further relief as the Court deems just and proper despite absence of an express request set forth herein.

WHEREFORE, Fried demands judgment against the Company and Charles Stiefel and the Company, jointly and severally, for the relief set forth in paragraph 146 above.

## COUNT 6

## FRAUD AND CIVIL CONSPIRACY AGAINST THE COMPANY
## AND THE STIEFEL DEFENDANTS
## (Florida law)

Fried incorporates the allegations of paragraphs 1 (as to state law claim), 2 (as to supplemental jurisdiction pursuant to 28 U.S.C. § 1367), 3 (as to Rule 4(k)(1)(A), Fed.R.Civ.P.),  4 (as to other torts), 5-16, 18-19, 22, 43-87, 89-101, and 103-104 as if fully set forth herein.

147.   The Company and the Stiefel Defendants carried out a plan, scheme, and course of conduct which was intended to and did: (a) deceive Fried as to the fair market value of his Company Stock; and (b) cause Fried to sell his Company Stock, which he acquired both as part of the

Employee Plan and separately, to the Company at artificially low prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Company and the Stiefel Defendants conspired to take and took the actions set forth in this Count and incorporated herein by reference.

148.   The Company and the Stiefel Defendants each: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (c) knew that these statements or omissions of material fact were untrue and/or knew that they omitted to state material facts necessary to make the statements not misleading and (d) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Fried in an effort to maintain artificially low prices for the Company Stock.

149.   The Company and the Stiefel Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal material information about the  fair market value of the Company Stock as more specifically set forth above.

150.   The Company's and the  Stiefel Defendants' misrepresentations and omissions of material information to Fried regarding the Blackstone Investment, the financial status of the Company and plans and efforts to sell the Company, were part of their campaign to reduce outstanding shares by inducing Fried to sell his shares to the Company using the 2007 and 2008 Valuations.  By virtue of these Defendantsø efforts, they were able to reduce the outstanding number of Company Stock and increase the value of the remaining shareholdersø Company Stock including the Stiefel Defendantsø own.

151.   Examples of misrepresentations and omissions of material information the Company and the Stiefel Defendants made to Fried also include, without limitation, the following:

a.    Knowingly and intentionally misrepresenting, or omitting material information, to Fried in his September 2007 meeting with Charles Stiefel and afterwards regarding the nature and terms of the Blackstone Investment and its relation to the 2008 Bogush Valuation when Charles Stiefel, other Company and Charles Stiefel knew that Fried would rely on their information to decide to sell his 10 non-Employee Plan shares of Company Stock back to the Company, and by failing to correct the misrepresentations prior to Fried's sales of his shares, knowingly and intentionally misrepresenting to Fried in the October 2008 meeting with Charles Stiefel the expected performance and financial difficulties of the Company, omitting disclosure of plans for the Company's sale, omitting to correct earlier representations regarding the Blackstone Investment, and omitting to disclose steps taken or planned to sell the Company, all prior to Fried's sale of his Company stock in the Employee Plan while knowing that Fried would rely upon such information in deciding to sell the Company stock;

b.    Intentionally failing in December 2008 and January 2009 to inform Fried of the plans to sell the Company and actions taken in furtherance thereof, and to conceal such facts even though they knew Fried was taking steps to sell his Company Stock and that Fried was relying upon information furnished through Charles Stiefel and the Company as being accurate and complete;

c.    In written correspondence including, without limitation, written communications to Fried dated December 28, 2007 and December 29, 2008, at meetings as well as in the annual letters by Charles Stiefel, as Chairman, CEO and President of the Company **(Composite Exhibit C)**:

(1) Misrepresenting that the Bogush Valuations provided an accurate fair market value of the Company Stock owned by Fried, both as part of the Employee Plan and separately, when in fact they grossly understated the accurate fair market value;

(2) Concealing the accurate fair market value of the Company Stock;

(3) Failing to disclose that the purchase price of the shares did not represent the accurate fair market value of the shares of the Company Stock held by Fried in the Employee Plan and separately thereof;

(4) Intentionally misrepresenting the interest rate of the promissory note applicable to the unpaid balance remaining upon closing the sale of Company Stock Fried held in the Employee Plan; and

(5) Concealing the fact that a decision had been reached and steps taken to sell the Company for a share price in excess of $60,000 per share.

152.    The Company and the Stiefel Defendants knew that the statements and omissions referenced herein were false and misleading and that the failure to disclose material facts would affect the determination by Fried as to whether to put his shares to the Company, and willfully and intentionally misled Fried.

153.    In ignorance of the fact that the value of the securities was artificially depressed, and reasonably relying directly or indirectly on the false and misleading statements made by these Defendants, or in the absence of material information that was known to these Defendants but was intentionally withheld by them, both Fried's Employee Plan Stock and his separately held Company Stock were sold to the Company in 2008 and 2009 at artificially low prices, thus increasing the Stiefel

Defendants' respective ownership percentages of the Company and the proceeds they would receive in any sale of the Company.  Plaintiff Fried was thereby directly and proximately damaged.

154.    At the time of these misrepresentations and omissions, Plaintiff Fried believed all statements were true and was unaware of any omissions or inaccuracies, nor did he have a reasonable basis for believing such information to be incomplete or inaccurate. Had Fried known of the intentions, plans and efforts to sell the Company or of the accurate fair market value of the Company Stock, including the effect of the Blackstone Investment and Glaxo Sale on the fair market value of the Company Stock, Fried would not have caused his shares of Company Stock to be sold to the Company or would not have done so at the artificially depressed valuations which he actually received from the Company.

155.    By virtue of the foregoing, the Company and the Stiefel Defendants acted in concert to defraud Fried.

156.    As a direct and proximate result of the fraudulent and conspiratorial conduct of the Company and the Stiefel Defendants, Plaintiff Fried suffered damages in connection with sales of Company Stock and is entitled to all available relief permitted including, but not limited to, the following:

    a.   Awarding compensatory damages in favor of Plaintiff Fried against the Company and the Stiefel Defendants, jointly and severally, for all damages sustained as a result of these Defendants' wrongdoing, in an amount to be proven at trial, plus pre-judgment interest thereon at the legal rate;

    b.   Punitive or exemplary damages in the amount found by the jury for Defendants' tortuous and wrongful conduct;

    c.   Such other and further relief as the Court deems just and proper.

WHEREFORE, Fried demands judgment against the Company and Stiefel Defendants, jointly and severally, for all relief set forth in this Count.

**<u>Request for Trial by Jury</u>**

Plaintiff requests trial by jury of all claims so triable as of right.

Respectfully submitted this March 11, 2011.

SEGALL GORDICH P.A.
*Counsel for Plaintiff*
801 Brickell Ave., Suite 900
Miami, Florida 33131
(305) 755-49372; Fax: (305) 438-7438

/s/ Norman S. Segall
NORMAN S. SEGALL
nss@segallgordich.com
Florida Bar No. 158302
SUNDEEP K. MULLICK
skm@segallgordich.com
Florida Bar No. 18175
MELISSA ALAGNA
mma@segallgordich.com
Florida Bar No. 40555