IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 1:11-cv-20853-JAL

RICHARD I. FRIED,

    Plaintiff,

v.

STIEFEL LABORATORIES, INC., a
Delaware corporation, CHARLES W.
STIEFEL, BRENT D. STIEFEL, TODD
STIEFEL, STEPHEN KARASICK,
MICHAEL CORNELIUS, MATT S.
PATTULLO, and ANJAN MUKHERJEE,

    Defendants.
_____/

**DEFENDANTS' MOTION TO DISMISS COUNTS 4, 5, AND 6 OF THE
COMPLAINT IN THEIR ENTIRETY AND COUNT 3 OF THE COMPLAINT,
IN PART, AND INCORPORATED MEMORANDUM OF LAW**

    Plaintiff is the former CFO of Stiefel Laboratories, Inc ("SLI" or the "Company"). The crux of his Complaint is that he was treated the same as every other shareholder and not made privy to certain confidential information. Apparently, Plaintiff thought his friendship with Charles Stiefel ("Charlie"), the Company's CEO, and his former working relationship with many of SLI's officers and directors entitled him to special treatment. When he did not receive this special treatment, he sued the Company, Charlie, and several of SLI's former directors and officers. Plaintiff's Complaint asserts violations of ERISA (Counts 1 and 2), federal securities laws (Count 3), and state law breach of fiduciary duty, promissory estoppel, and fraud and conspiracy claims (Counts 4-6). For the reasons discussed below, Counts 4, 5, and 6 should be dismissed in their entirety and Count 3 should be dismissed to the extent it is based on Plaintiff's March 2008 sale of stock.

## MEMORANDUM OF LAW
## SUMMARY OF FACTUAL ALLEGATIONS

### I. PLAINTIFF'S ACQUISITION OF SLI STOCK

Plaintiff is a former employee of SLI, a privately held pharmaceutical company that specializes in dermatological products. (Compl. ¶¶ 6-7). He is also a former participant in the SLI Employee Stock Bonus Plan ("ESBP"), an ERISA-governed benefit plan under which he accumulated shares of SLI common stock and had the right to "put" those shares to SLI, at a price set annually by an independent valuator, after he left SLI's employ. (*Id.* ¶¶ 6, 38-41). During the years in question, the independent valuator was Terrence Bogush of Bogush & Grady ("Bogush"). (*Id.* ¶ 41). Under the ESBP, Plaintiff acquired 30.7881 shares of SLI common stock (the "ESBP stock"). (*Id.* ¶ 64). Plaintiff also directly purchased 10 shares of SLI common stock that were never part of the ESBP (the "non-ESBP stock"). (*Id.* ¶¶ 6, 65).

### II. THE BLACKSTONE INVESTMENT

On August 7, 2007, the Blackstone Group invested $500 million in SLI in exchange for (1) 8,277 shares of preferred stock; (2) guaranteed dividends in the form of additional preferred shares each year; (3) a put right, which effectively created a guaranteed return and a guaranteed exit date for Blackstone in 8 years; (4) a liquidation preference over common shares; (5) a board of directors seat and vote; and (6) unilateral veto rights over any material corporate transaction by SLI. (Blackstone Agreement, attached as Ex. A).[1]

---

[1] In ruling on a Rule 12(b)(6) motion, the Court may rely on exhibits to the complaint, documents referenced in the complaint, documents central to the plaintiff's claims, and public records. *Brooks v. Blue Cross & Blue Shield, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Bickley v. Caremark RX, Inc.*, 471 F.3d 1325, 1329 (considering ERISA plan documents on motion to dismiss); *Salinger v. Projectavision, Inc.,* 972 F. Supp. 222, 226 (S.D.N.Y. 1997) (noting that "a court may consider…the full text of press releases, magazine articles, analyst's reports, and wire service stories that are referred to or quoted from in the complaint"). In this context, the Eleventh Circuit has observed that "[t]he usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in its context." *Harris v. IVAX Corp.,* 182 F. 3d 799, 801 n.2 (11th Cir. 1999); *In re Copper Mountain Secs. Litig.,* 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (finding it is proper to take judicial notice of press releases and other "information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements.").

Although Plaintiff claims that the per share price paid by Blackstone for its preferred shares and other rights means that the common shares should have been valued at the same price, public information available at the time exposes the fallacy in that position.  Moody's, for example, published a report in which it concluded that Blackstone's preferred stock was "75% debt-like due to its fixed maturity date and its dividend (PIK) features."  (Ex. B, p.3).  In a credit rating report dated January 3, 2008, Standard & Poor's likewise published that it "views the $500 million in preferred [Stiefel] stock, held by Blackstone, as 100% debt."  (Ex. C, pp-2-3, and Ex. D, p.2).

III.   THE MERGER DISCUSSIONS AND EVENTUAL SALE

In November 2008, Blackstone allegedly first began to discuss the "possible sale" of SLI with a potential purchaser.  (Compl. ¶ 55).  On December 22, 2008, Charlie met with the CEO of this "then-potential acquirer."  (*Id.* ¶ 59).  By the end of January 2009, all that had happened was that five companies had allegedly "indicated an interest" in possibly acquiring SLI. (*Id.* ¶ 60a).  Plaintiff does not allege that any price had been offered or even discussed with SLI by any potential acquirer as of February 2009.  During February 2009, the Company's management met with and gave presentations to four companies, including on February 26, 2009, to GlaxoSmithKline ("GSK"), the public company that ultimately acquired SLI.  (*Id.* ¶ 60b).

On March 20, 2009, the Wall Street Journal disclosed publicly that SLI was considering a sale.  (*Id.* ¶ 60d).  The article, however, also reported that SLI had received no offers yet. (Attached as Ex. E).  The first non-binding offers came on March 24, 2009, when GSK and another company submitted bids, and due diligence continued "through mid-April 2009."  (*Id.* ¶ 60e).  During April 17-19, 2009, the terms of the merger agreement were negotiated, and it was approved by SLI's Board on April 19, 2009 and signed on April 20, 2009.  (*Id.* ¶ 60f-g).  The merger was publicly announced on April 20, 2009.  (*Id.* ¶ 95).  GSK paid a flat amount (less some holdbacks) for all outstanding shares.  (*Id.* ¶ 103).

IV.   PLAINTIFF'S SALE OF SLI STOCK

   A.   SALE OF NON-ESBP STOCK

Plaintiff sold his 10 shares of non-ESBP stock to SLI on March 6, 2008.  (*Id.* ¶ 78).  He sold these shares for a price of $13,065 per share.  (*Id.*).  The price was set by applying a 10% discount to the most recent, annual valuation of ESBP stock performed

by Bogush, which in this case was the March 31, 2007 per share valuation of $14,517. (*Id.*). Plaintiff claims that SLI and Charlie committed fraud because they (1) falsely represented that the $14,517 price was a fair market price for shares of stock held by the ESBP as of March 31, 2007; and (2) did not disclose "enterprise valuations" by Blackstone and other private equity firms, which Plaintiff believes proves that the ESBP price was understated. Plaintiff also claims that, on September 27, 2007, he met with Charlie in advance of the annual shareholder's meeting. (*Id.* ¶¶ 72-74). Plaintiff alleges that during this meeting he discussed the recently announced Blackstone investment with Charlie and that Charlie "intentionally and misleadingly represented to Fried that even though the number of Series A preferred shares issued to Blackstone was based upon a valuation of the Company Stock at $60,000 per [preferred] share, this price did not indicate that the Bogush Valuations were in any way incorrect or understated". (*Id.* ¶ 75).

### B. SALE OF ESBP STOCK

In late December 2008, pursuant to the terms of the ESBP and ERISA, Plaintiff requested and received a distribution of the shares of stock held in his ESBP account (the "ESBP stock"). (*Id.* ¶¶ 86-87). The stock was distributed to Plaintiff on or about December 29, 2008. (*Id.* ¶ 87). The accompanying cover letter, sent by Defendant Matt Pattullo acting as Plan Administrator, explained that Plaintiff had the option to put the stock to SLI during one of two 60-day windows. (*Id.*). The letter also explained that any sales proceeds would be paid 20% in cash with the balance paid as a promissory note bearing interest at a 7.25% interest rate. (*Id.*).

On January 6, 2009, Plaintiff exercised his right under the terms of the ESBP and ERISA to put his ESBP stock to SLI. (*Id.* ¶¶ 89-90). On January 30, 2009, SLI sent a check and promissory note, bearing an interest rate of 3.25%, to Plaintiff. (*Id.* ¶ 91). Plaintiff claims that he complained to Charlie that the interest rate of 3.25% on the promissory note was lower than was promised in Pattullo's letter but that no action was taken. (*Id.* ¶ 92). Plaintiff claims that the higher interest rate promised in the letter caused him to put his ESBP stock to SLI. (*Id.* ¶ 87).

### V. PLAINTIFF'S POST-SALE COMMUNICATIONS WITH CHARLIE

After learning of the sale of SLI to GSK, Plaintiff contacted Charlie and told him that he wanted the alleged loss he had suffered to be corrected. (*Id.* ¶ 87). Charlie allegedly

3

responded: "Given our long friendship, I will endeavor to come up with something that will make you happy." (*Id.* ¶ 96). Charlie also allegedly discussed several possible ways to resolve Plaintiff's concern, including Plaintiff filing a "friendly lawsuit." (*Id.*¶ 98).

After allegedly informing Plaintiff that none of these options were viable, Plaintiff claims he threatened to file a lawsuit. (*Id.* ¶ 99). Charlie allegedly implored Plaintiff not to file a lawsuit, as it could derail the closing of the acquisition by GSK, and allegedly promised "to find a method to compensate Fried." (*Id.* ¶ 99). Plaintiff claims he relied on this promise to his detriment by refraining from filing a lawsuit at that time. After the GSK transaction closed, Plaintiff allegedly followed up with Charlie about resuming the dialogue concerning his stock sales. Charlie allegedly told Plaintiff that he no longer held any position with SLI and thus could not be of assistance. (*Id.* ¶ 101). Plaintiff filed this lawsuit over a year after this last conversation allegedly occurred.

## **PLAINTIFF'S CLAIMS**

In his Complaint, Plaintiff asserts claims for breach of fiduciary duty and co-fiduciary duty under ERISA (Counts 1 and 2). Plaintiff's ERISA claims are based on his allegation that he would not have put his shares of ESBP stock to SLI in January 2009 if (1) he had been informed of the potential merger discussions that allegedly began in November 2008; or (2) had been informed that the promissory note would bear an interest rate of 3.25% and not 7.25%. (*Id.* ¶¶ 87, 91-93). Plaintiff also asserts, in the alternative, that Bogush's March 31, 2008 valuation of stock held by the ESBP was understated and that the Fiduciary Defendants knew or should have known it was understated. (*Id.* ¶¶ 113, 119).

Count 3 asserts claims for federal securities fraud against Charlie and SLI. (*Id.* ¶¶ 122-133). Specifically, with respect to the March 2008 sale of his non-ESBP stock, Plaintiff claims that Charlie and SLI violated federal securities law by misrepresenting and/or omitting material information relating to the Blackstone investment and its relationship to the March 31, 2008 valuation of ESBP stock. (*Id.* ¶ 127a). With respect to his put of ESBP stock in January 2009, Plaintiff alleges that Charlie made misrepresentations and omissions between October 2008 and January 2009, including, but not limited to: (1) the expected performance and financial difficulties of SLI; (2) omitting information of the alleged plans to sell SLI; (3) disclosing the terms of the Blackstone investment in a way that allegedly misled Plaintiff into believing the price

4

paid per preferred share by Blackstone cannot be equated to the value of common shares; and (4) misrepresenting the interest rate in the promissory note he received following his put of ESBP stock. (*Id.* ¶ 127).

In Count 4, Plaintiff asserts state law breach of fiduciary duty claims against Charlie and SLI. Like Count 3, Plaintiff's claims are based on the March 2008 sale of his non-ESBP stock and the January 2009 put of his ESBP stock and involve many of the same allegations of misrepresentations and omissions as set forth in Count 3. (*Id.* ¶¶ 134-140).

In Count 5, Plaintiff asserts a promissory estoppel claim based on Charlie's alleged promise "to find a method to compensate Fried" if he held off filing a lawsuit. (*Id.* ¶¶ 141-146). Finally, Plaintiff asserts in Count 6 state law fraud and civil conspiracy claims against SLI and Charlie, Todd, and Brent Stiefel. (*Id.* ¶¶ 147-156). Notably, Plaintiff does not assert any alleged act or omission by Todd or Brent Stiefel.

## ARGUMENT

### I. PLAINTIFF'S SECURITIES FRAUD CLAIM (COUNT 3) MUST BE DISMISSED AS TO HIS MARCH 2008 SALE OF NON-ESBP STOCK

In Count 3, Plaintiff asserts he was defrauded as to (1) his March 2008 sale of 10 shares of non-ESBP stock when he sold them to SLI at a price which was 10% less than the "as of March 31, 2007" valuation of ESBP stock; and (2) his January 2009 put of ESBP stock at the March 31, 2008 ESBP valuation. As to the latter transaction, Defendants recognize that Judge King previously addressed a somewhat similar set of allegations made in the *Bacon* case (Case No. 09-21871) and concluded that the plaintiffs there made sufficient allegations to survive a motion to dismiss. (Case No. 09-21871, DE 43 at 18). Defendants cross-reference and incorporate their arguments (Case No. 09-21871, DE 21 and 41) herein.

As to the March 2008 transaction, however, Plaintiff's allegations were not addressed in *Bacon*.[2] In support of this claim, Plaintiff alleges that SLI and Charlie

---

[2] The *Bacon* claims are limited to put transactions made pursuant to the terms of the ESBP and ERISA. (*See* Case No. 09-21871, D.E. 1, 47, 124). Those put rights are not applicable to direct stockholders. Because Plaintiff's March 2008 stock sale involved shares of stock he purchased outside the ESBP, he had no right to put those shares to SLI, let alone a right to receive any particular price per share. Judge King's Order (Case No. 09-21871, D.E. 43) in *Bacon* did not address such sales of stock by direct stockholders.

5

committed fraud because they (1) falsely represented that $14,517 per share was a fair market price as of March 31, 2007 for SLI common stock held by the ESBP (which was not the type of stock that Plaintiff sold in March 2008); and (2) failed to disclose Blackstone's and other private equity investors' "enterprise valuations" for SLI (which Plaintiff alleges somehow suggest that the $14,517 valuation was understated). This claim must be dismissed because the allegations do not establish any duty that was violated and fall far short of showing a strong inference of scienter.

### A. Plaintiff's Claim Fails Because There Was No Duty To Disclose

As a threshold matter, Plaintiff does not allege that either SLI or Charlie ever represented that the Bogush valuations for the ESBP stock were directly applicable to the value of non-ESBP stock. Instead, he asserts that SLI and Charlie (1) represented that the Bogush valuation was the "fair market value" for the shares of common stock held by the ESBP as of March 31 of the applicable Plan year; and (2) SLI typically offered to pay a direct stockholder something less than the most recent Bogush valuation for shares of non-ESBP common stock. (Compl. ¶ 78). Those allegations alone defeat Plaintiff's claim because Plaintiff was selling non-ESBP shares in March 2008 and neither SLI nor Charlie are alleged to have commented on the value of those shares at that time. In fact, it is undisputed that the Bogush valuations were always as of March 31 of a given year and were never represented to be an indicator of fair market value on another date. (*See id.*). Thus, when Plaintiff sold his shares to SLI on March 8, 2008 based on a 10% discount off the March 31, 2007 Bogush valuation, he knew that the Bogush valuation was already almost one year old at the time and not necessarily indicative of the value of his shares as of March 8, 2008.[3]

Similarly, neither SLI nor Charlie had any duty to disclose private equity firms' "enterprise valuations" for preferred stock investments, particularly when publicly

---

[3] SLI had no obligation to buy back any non-ESBP shares. According to Plaintiff, SLI had a practice of buying such non-ESBP shares only at a discount of at least 10% off the ESBP stock valuation, provided it had cash available at the time. (Compl. ¶ 78). Because the non-ESBP stockholder had no put or other right to cause SLI to buy his shares, let alone to buy them at any given price, he was free to negotiate an alternative price and to obtain his own stock valuation expert to value his shares of non-ESBP stock.

available information disclosed why the Blackstone preferred share[4] price cannot be equated to either (1) the Bogush valuation of the minority interest the ESBP held in SLI common stock; or (2) any valuation of Plaintiff's 10 shares of non-ESBP common stock, which had no put rights attached to them, received no dividends, and had no "control" rights over corporate events.  (*See* Compl. ¶¶ 37, 43, 52, 75; *see also* Ex. F, Bogush's March 31, 2007 valuation of stock held in the ESBP).

On August 7, 2007, Blackstone invested $500 million and received (1) 8,277 preferred shares; (2) guaranteed dividends in the form of additional preferred shares each year; (3) a put right which effectively created a guaranteed return and a guaranteed exit date for Blackstone in 8 years; (4) a liquidation preference over common shares; (5) a board of directors seat and vote; and (6) unilateral veto rights over any material corporate transaction by SLI. (*See* Ex. A).  Indeed, Moody's published a report in which it concluded that Blackstone's preferred stock was "75% debt-like due to its fixed maturity date and its dividend (PIK) features."  (Ex. B, p.3).  In a report dated January 3, 2008, three months before Plaintiff sold his 10 non-ESBP shares, Standard & Poor's "view[ed] the $500 million in preferred [Stiefel] stock, held by Blackstone, as 100% debt." (Ex. C, pp. 2-3, and Ex. D, p.2).  Since Moody's considered the $500 million Blackstone investment to be only 25% "equity," under Plaintiff's logic (as inapposite as it is), the per share value would be only $15,102 per share ($125 million divided by 8,277), and per Standard & Poor's, the equity value would be <u>zero</u> since it determined that the preferred shares investment was 100% debt.

No duty to disclose anything further to Plaintiff about the Blackstone investment existed because the Blackstone preferred shares investment was also public knowledge and available to Plaintiff.  This independently precludes any securities fraud claim here.

---

[4] By their nature, preferred shares are fundamentally different than common shares in that they are more like debt than equity and often carry with them a guaranteed return, veto rights over deals, superior priority rights in the capital structure, rights to dividends and rights of control and influence.  "Preferred stock…often has both debt and equity characteristics, and some preferred stocks may effectively have maturity amounts and dates at which they must be redeemed for cash." *Bolt v. Merrimack Pharms., Inc.,* 503 F. 3d. 913, 920 n.9 (9th Cir. 2007); *see also Koopers Co., Inc. v. Am. Express Co.* 689 F. Supp. 1408, 1412 (W.D. Pa. 1988) ("Preferred stock is commonly understood to represent an equity interest but with many of the characteristics of debt.").

7

First, the August 10, 2007 Miami Herald article referenced in the Complaint first informs the public of Blackstone's $500 million investment for preferred shares and notes that the transaction did not involve the trading of common shares. (Ex. G). Second, Standard & Poor's generated a report dated January 3, 2008 in which it stated that it "view[ed] the $500 million in preferred [Stiefel] stock, held by Blackstone, as 100% debt." (Ex.. C). Plaintiff cannot ground a securities fraud claim with publicly available information like this. *In re Miller Indus., Inc. Secs. Litig.,* 120 F. Supp. 2d 1371, 1378 (N.D. Ga. 2000) (finding no duty to disclose is triggered "if sufficient information already exists in the public domain"); *Johnson v. Wiggs,* 443 F.2d 803, 806 (5th Cir. 1971) (there is no duty to disclose information which had been "publicly proclaimed in several ways on several occasions").

### B. There Is No Strong Inference Of Scienter

To establish liability under §10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, (2007). As the Supreme Court recently stated in *Matrixx Initiatives, Inc. v. Siracusano:*

> Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. This standard requires courts to take into account plausible opposing inferences. A complaint adequately pleads scienter under the PSLRA only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

--- S. Ct. ---, 2011 WL 977060 (March 22, 2011) (internal citations omitted).

That SLI and Charlie considered the Blackstone preferred shares to be fundamentally different than the shares of common stock is the most plausible inference from Plaintiff's allegations. It is not plausible that "$60,000 per preferred share" equates to $60,000 per common share (or anything close to it) due to the "convertibility" term of Blackstone's investment. (Compl. ¶ 76). In fact, such an inference is disingenuous, especially for a former-CFO like Plaintiff, to even suggest. Blackstone would be insane to convert its preferred shares - which carried many valuable rights - to common shares unless and until the common shares were about to be sold in an IPO, merger or other

8

acquisition at a price acceptable to Blackstone (otherwise, Blackstone would veto the transaction and not convert its shares).

"A plaintiff need not disprove every conceivable rationale a defendant might put forward to explain why a particular statement [or omission] was made.  However, if the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial inference of scienter, then that plaintiff's facts cannot be fairly said to raise a 'strong inference' that the defendant acted with the required state of mind." *In re Sportsline,* 366 F. Supp. 2d at 1164; *see also Tellabs,* 551 U.S. at 328 (to overcome a motion to dismiss, a "plaintiff alleging fraud in a § 10(b) action… must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference."); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1257 (11th Cir. 2008) (holding that allegations in the complaint fail to "surmount the pleading hurdles that Congress has imposed on private securities fraud class actions" because the inference Plaintiff has drawn is not "at least as compelling as any opposing inference.").

By the time of Plaintiff's March 2008 sale of his non-ESBP stock, an independent rating agency opined in January 2008 that Blackstone's preferred shares should be considered 100% debt and not equity. (*See* Ex. C).  This is fully consistent with Charlie's alleged representations to Plaintiff.  In sum, SLI and Charlie had no scienter, let alone a strong inference of scienter, as required by the PLSRA.  For these reasons, Plaintiff's March 2008 stock sale claim under the federal securities laws must be dismissed.

## II.   THE STATE LAW CLAIMS MUST BE DISMISSED

### A.   Plaintiff's State Law Claims For Breach Of Fiduciary Duty (Count 4) And Fraud And Civil Conspiracy (Count 6) Are Preempted By ERISA To The Extent They Are Premised On The Sale Of His ESBP Stock

Plaintiff's state law claims in Counts 4 and 6 fall into one of two categories: (1) claims based on Plaintiff's sale of his non-ESBP stock in March 2008; and (2) claims based on his put of ESBP stock in January 2009.  The claims which fall into the second category are preempted by ERISA.

ERISA expressly supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan…". 29 U.S.C. § 1144(a).  Absent a statutory exception, ERISA preempts not only state statutes, but also state common law

9

theories of recovery which relate to ERISA plans. *See* 29 U.S.C. § 1144(c)(1); *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 216 (2004) (any state law claim based on the terms of a plan is preempted). "[A] state law claim is defensively preempted under ERISA if it relates to an ERISA plan." *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1179 (11th Cir. 2006). In interpreting the phrase "relates to," the Supreme Court has held that a state law claim is preempted if it "has a connection with or reference to a benefit plan." *Miami Children's Hosp., Inc. v. Kaiser Found. Health Plan, Inc.*, 2009 U.S. Dist. LEXIS 51696, *13 (S.D. Fla. May 29, 2009); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983) (same). "A state law may 'relate to' a benefit plan, and thereby be preempted, even if the law is not specially designed to affect such plans, or the effect is only indirect." *Sanson v. Gen. Motors Corp.*, 966 F.2d 618, 621 (11th Cir. 1992). Indeed, where the allegations show any "nexus with the ERISA plan and its benefits system," state law claims are preempted by ERISA and must be dismissed. *Variety Children's Hosp., Inc. v. Century Med. Healthy Plan*, 57 F.3d 1040, 1042 (11th Cir. 1995).

Plaintiff is attempting to assert state law fiduciary duty claims against Charlie and SLI and fraud and civil conspiracy against SLI and Charlie, Todd, and Brent Stiefel based on the allegedly inadequate Bogush valuations. In particular, Plaintiff is claiming that (1) he received a distribution of his SLI stock from the ESBP; (2) he had the right, pursuant to the terms of the ESBP and ERISA, to put his ESBP stock to the Company at "fair market value"; (3) under the terms of the ESBP and ERISA, because SLI's stock was not publicly traded, the "fair market value" of the stock held by the ESBP had to be appraised by a qualified independent appraiser at least annually; (4) Bogush was not a qualified independent appraiser, as defined by the Plan and ERISA, and therefore the "fair market value" valuations he performed were incorrect; (5) Bogush's March 31, 2008 valuation was flawed because Bogush either failed to take into account the Blackstone investment or the Plan fiduciaries failed to disclose that information to him; and (6) Plaintiff was harmed as a result. (Compl. ¶¶ 37-48, 86-93, 134-140, 147-156).

The "rights" asserted by Plaintiff are rights that exist solely as a result of the ESBP. Notably, no other category of direct or beneficial stockholder had a "put" right, let alone a right to put shares of stock to the Company at "fair market value." These rights exist for ESBP participants solely as a result of ERISA and the ESBP. Thus, "but

10

for" the ESBP, Plaintiff would have no state law cause of action based on his put of his ESBP stock to SLI at allegedly less than fair market value. *See Sanson*, 966 F.2d at 621 (state law claim alleging misrepresentation preempted where liability is premised upon plan terms or ERISA or where measure of damages is the difference between what plaintiff received under the plan and what he would have received absent the misrepresentation); *Hall v. Blue Cross/Blue Shield*, 134 F.3d 1063, 1066 (11th Cir. 1998) (state law fraudulent inducement claims preempted by ERISA); *Eisenberg v. Trans World Airlines, Inc.*, 654 F. Supp. 125, 128 (S.D. Fla. 1987) (state law fraud and conspiracy claims preempted by ERISA)). Accordingly, Counts 4 and 6 should be dismissed to the extent they are based on Plaintiff's January 2009 put of ESBP stock. *See id.*; *see also* Judge King's January 4, 2010 Order, Case No. 09-21871, D.E. 43 at 23-27.

> **B.  The Fiduciary Duty Claims (Count 4) Are Also Subject To Dismissal Because Charlie Had No Duty To Disclose The Merger Discussions, He Did Not Receive A Unique Benefit, And There Is No Vicarious Liability**
>
> **1.  Charlie Had No Duty To Disclose The Merger Discussions To Shareholders Until The Shareholders Were Asked To Vote**

Under Delaware law, which is the law applicable to Count 4,[5] "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control [only] *when it seeks shareholder action.*" *Stroud v. Grace,* 606 A.2d 75, 84 (1992) (emphasis added). In other words, "Delaware law does not require a Board to divulge material developments with respect to the company's business if the board does not seek the vote of the shareholders." *Kahn v. Roberts,* No. 12324, 1995 WL 745056, *8 (Del. Ch. Dec. 6, 1995); *see also Raskin v. Birmingham Steel Corp.,* No.

---

[5] This Court must apply the Florida choice of law doctrines. *See Klaxon Co. v. Stentor Elec. Mfg. Co*, 313 U.S. 487, 496 (1941). Fiduciary duty claims brought in Florida courts against a corporation's directors and officers are determined under the laws of the state of incorporation. *See Chatlos Found., Inc. v. D'Arata*, 882 So. 2d 1021, 1023 (Fla. 5th DCA 2004) (claims "involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation."); *International Ins. Co. v. Johns,* 847 F.2d 1447, 1458 n. 19 (11th Cir. 1989) (under Florida choice-of-law rules, "the law of the state of incorporation governs the liabilities of the officers or directors"). Because SLI is a Delaware corporation (Compl. ¶ 7), Delaware substantive law controls the resolution of the common law claims asserted in the Complaint. *See Mukamal v. Bakes*, 383 B.R. 798, 817-18 (S.D. Fla. 2007) (Delaware law applies to fiduciary duty claims involving Delaware corporation with its headquarters in Florida).

11

11365, 1990 WL 193326, *5 (Del. Ch. Dec. 4, 1990) ("The state law duty of candor arises when the board elects or has a duty to seek shareholder action… If the board does not seek shareholder action at a meeting, through consent, in a tender or exchange offer, or otherwise, it has, in my opinion, no distinctive state law duty to disclose material developments with respect to the company's business."). Here, after the Company's Board approved the merger agreement with GSK on April 20, 2009, it made a public announcement of the deal. (Compl. ¶ 95). These actions comport with Delaware law because the Company and Charlie had no duty to disclose the preliminary merger talks to Plaintiff at the time he sold his stock.

### 2. Count 4 Fails To Allege That Charlie Received Some Unique Benefit And Thus Is Not A Viable Claim

Although Plaintiff alleges that Charlie acquired a "personal benefit or advantage not also enjoyed by Fried" (Compl. ¶ 135), he alleges no facts to support that conclusory statement. In fact, Plaintiff admits that every time shares were put to SLI and retired to treasury pursuant to the ESBP, every shareholder (and continuing ESBP participant) gained a mathematical, proportionate increase of his existing (direct or indirect) interest in SLI. (*Id.* ¶¶ 126, 139, 150). To the extent this effect could be deemed a "benefit," it is not actionable because "a benefit which devolves upon the corporation or all shareholders generally" does not constitute self-dealing. *Aronson v. Lewis,* 473 A. 2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner,* 746 A. 2d 244 (Del. 2000); *In re J.P. Morgan Chase & Co. Shareholder Litig.,* 906 A.2d 808, 821 (Del. Ch. 2005) (finding that there was no self-dealing where plaintiffs did not allege that directors "received any personal financial benefit from it other than one that devolved on all…stockholders alike."). Because the alleged benefit at issue was not unique to Charlie, Count 4 must be dismissed.

### 3. There Is No Vicarious Liability For Breach Of Fiduciary Duty

Plaintiff incorrectly alleges in Count 4 that SLI can be held vicariously liable for Charlie's alleged state law breach of fiduciary duty. (Compl. ¶ 140). It is well-established under Delaware law that a company cannot be held vicariously liable for a breach of fiduciary duty. *See, e.g., Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 540 (Del. 1996) ("Holding the corporation vicariously liable for the directors' breach of a fiduciary duty 'would be flatly inconsistent with the rationale of vicarious liability since it would shift the

cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach.'"); *NRG Barriers v. Jelin*, No. 15013-NC, 1996 Del. Ch. LEXIS 99, *18 (Del. Ch. Aug. 6, 1996) ("A corporation is not liable for its directors' breach of fiduciary duty.").

### C. The Promissory Estoppel Claim (Count 5) Fails As A Matter Of Law

To state a claim for promissory estoppel, Plaintiff must allege: (1) he detrimentally relied upon a promise made by Defendant; (2) that the Defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of Plaintiff; and (3) that injustice can be avoided only by enforcement of the promise against the Defendant. *See W.R. Grace & Co. v. Geodata Serv., Inc.*, 547 So.2d 919, 924 (Fla. 1989). With respect to the first element, the alleged promise must be "sufficiently definite in time or term or reasonableness" to reasonably induce reliance. *Id.* at 925. "Florida courts have rejected promissory estoppel claims where the alleged promise 'was not definite but, on the contrary, was entirely indefinite as to terms and time'." *Locke v. Wells Fargo Home Mortg.*, No. 10-60286-Civ-COOKE/BANDSTRA, 2010 U.S. Dist. LEXIS 126140, *11-13 (S.D. Fla. Nov. 30, 2010). Moreover, even if a promise is definite, the doctrine of promissory estoppel is inapplicable if the promise involves present intentions to perform future acts. *See American Coach Lines of Orlando, Inc. v. N. Am. Bus Indus.*, No. 6:09-cv-1999-Orl-19GJK, 2011 U.S. Dist. LEXIS 14417, *76 (M.D. Fla. Feb. 14, 2011); *W.R. Grace*, 547 So.2d at 924 ("[O]rdinarily, a truthful statement as to the present intention of a party with regard to his future act is not the foundation upon which an estoppel may be built.").

Here, Plaintiff alleges that after he complained to Charlie that he received less for his SLI stock than current SLI shareholders would receive if GSK acquired SLI, Charlie allegedly (1) told him that "Given our long friendship, I will endeavor to come up with something that will make you happy" (Compl. ¶¶ 95-96); (2) asked Plaintiff not to file "a lawsuit as it could derail the closing of the [GSK] sale" (*Id.* ¶ 99); and (3) promised "to find a method to compensate Fried." (*Id.* ¶¶ 99, 141). Although Plaintiff admits that Charlie "never provided a way to compensate Fried for his loss," Plaintiff alleges that he nevertheless relied on the vague promise of "his friend and confidant," Charlie, "to find a method to compensate Fried" and refrained from filing a lawsuit. (*Id.* ¶¶ 99, 100, 141).

Plaintiff's promissory estoppel claim fails as a matter of law for at least three reasons. First, the alleged promises--"I will endeavor to come up with something that will make you happy" and "to find a method to compensate [you]"--are too vague and indefinite as to reasonably induce reliance as a matter of law. *See, e.g., Locke*, 2010 U.S. Dist. LEXIS 126140, at *11-13 (the promise "was not definite or substantial in nature because the letter Wells Fargo sent to the Plaintiff only indicated an estimated amount that payments may be reduced to and did not give the terms for the new payment rate such as the duration of the new loan or the interest rate"; promissory estoppel claim dismissed with prejudice); *Bankers Trust Co. v. Basciano*, 960 So. 2d 773 (Fla. 5th Dist. Ct. App. 2007) (affirming dismissal of a promissory estoppel claim as alleged promise "to restructure a loan" too indefinite); *Bergman v. DeIulio*, 826 So. 2d 500, 504 (Fla. 4th DCA 2002) (alleged promise to enter into a future partnership agreement too indefinite).

Second, the alleged promise is a statement as to the present intention of Charlie with regard to a future act and, therefore, cannot serve as the basis for a promissory estoppel claim. *See, e.g.*, *American Coach*, 2011 U.S. Dist. LEXIS 14417, *76 (defendants' assurances "that they 'could — and would — resolve . . . issues' and that it 'would help' are insufficient to support a claim of promissory estoppel because those statements concern present intentions with regard to future acts").

Finally, Plaintiff's claim fails because, except for asserting that he delayed filing a lawsuit (for which he alleges no prejudice), Plaintiff fails to allege he suffered any harm by relying on Charlie's alleged promises. For all these reasons, Plaintiff's estoppel claim should be dismissed.

### D. Count 6's Fraud And Civil Conspiracy Claims Should Be Dismissed

As discussed in Section A above, to the extent Count 6 asserts a state law claim based upon Plaintiff's sale of his ESBP stock, it is preempted by ERISA and must be dismissed with prejudice. Plaintiff's remaining claim relating to the 10 non-ESBP shares Plaintiff sold to SLI in March 2008 also fails for the reasons set forth below.

#### 1. Plaintiff's Fraud Allegations Are Insufficient

Rule 9(b) requires that all fraud claims be stated with particularity. *See* Fed. R. Civ. P. 9(b). To satisfy the heightened pleading requirement, a plaintiff must plead: "(1) precisely what statements were made in what documents or oral representations or what

14

omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002). The requirement that fraud be pled with specificity applies with equal force to claims alleging conspiracy to commit fraud. *See Am. United Life Ins. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) ("where a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must also plead this act with specificity.").

Plaintiff's fraud claims against Todd and Brent Stiefel do not satisfy Rule 9(b)'s heightened pleading requirements. Plaintiff fails to allege any specific misrepresentation made by either Todd or Brent Stiefel and does nothing more than improperly lump the "Stiefel Defendants"—Charlie, Todd, and Brent Stiefel— together when alleging what misstatements and omissions were made to Plaintiff. (Compl. ¶¶ 150–51). "Where multiple parties are charged with fraud, the complaint must distinguish among defendants and specify their respective roles in the fraud. The allegations must alert defendants to the precise misconduct with which they are charged." *Leisure Founders v. CUC Int'l*, 833 F. Supp. 1562, 1575 (S.D. Fla. 1993); *see also Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 778 (7th Cir. 1994) ("in a case involving multiple defendants such as the one before us, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud'….We previously have rejected complaints that have 'lumped together' multiple defendants."); *Paine v. Domino's Pizza, LLC*, Case No. 10-23158, 2011 WL 1102788 at *5 (S.D. Fla. 2011) (dismissing Plaintiff's fraud-based claims where "Plaintiff fails to allege 'the precise statements' made, as well as the time and place the statements were made.").

Additionally, Plaintiff's fraud claims against SLI and Charlie fail because (1) there was no duty to disclose any additional information about the Blackstone investment to Plaintiff; and (2) there was no representation that the price paid to Plaintiff for his 10 shares of non-ESBP stock represented "fair market value." (*See*, Section I.A, *supra*).

### 2. Plaintiff's Civil Conspiracy Claims Fail As A Matter of Law

A cause of action for civil conspiracy requires: "'(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'" *Pierson v. Orlando Regional Healthcare Sys., Inc.*, 619 F.Supp.2d 1260, 1297 (M.D. Fla. 2009). Here, Plaintiff fails to specifically allege any facts concerning the formation or existence of an agreement between Defendants to defraud Plaintiff. Instead, Plaintiff simply alleges in conclusory terms that Defendants acted in "concert". (Compl. ¶¶ 149, 155). Plaintiff's allegations do not satisfy the requirements of Rule 9(b). *See, e.g*, *Martinez*, 480 F.3d at 1067–68 (dismissing conspiracy claim where plaintiffs "failed to state when" and "did not explain how" the co-conspirators agreed to engage in fraud"); *Hayduk*, 775 F.2d at 444 ("Without supporting facts regarding the circumstances surrounding the formation of the conspiracy to defraud plaintiffs or plaintiffs' basis for believing that a conspiracy existed for the purpose of defrauding them, the allegation becomes a conclusional accusation of the sort that is proscribed by Rule 9(b).").

Moreover, it is well-established that a Company and its directors cannot conspire with themselves. *See, e.g., Garrido v. Burger King Corp.*, 558 So. 2d 79, 81 (Fla. Dist. Ct. App. 3d Dist. 1990). "Under the intracorporate conspiracy doctrine, a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation." *Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1291 (M.D. Fla. 2009) (quoting *Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000). Accordingly, the civil conspiracy claims against SLI and its then-current directors, Charlie, Todd, and Brent Stiefel, must be dismissed. *See, e.g., Leisure Founders v. CUC Int'l*, 833 F. Supp. 1562, 1575 (S.D. Fla. 1993) (conspiracy to commit fraud claim dismissed against Company, its CEO, and CFO under intracorporate conspiracy doctrine).

### CONCLUSION

For the foregoing reasons, Defendants ask the Court to dismiss Counts 4, 5, and 6 of the Complaint in their entirety and to dismiss Count 3 to the extent the claims are based on Plaintiff's sale of his non-ESBP stock in March 2008.

Dated: April 29, 2011                              Respectfully submitted,

                                                                GREENBERG TRAURIG, P.A.
                                                                Wells Fargo Center
                                                               333 S.E. 2nd Avenue
                                                               Miami, Florida  33131
                                                              Telephone: (305) 579-0500
                                                              Facsimile:  (305) 579-0717

                                     By:     /s/ David A. Coulson
                                                              Hilarie Bass
                                                              Florida Bar No. 334243
                                                             E-Mail:  bassh@gtlaw.com
                                                             David A. Coulson
                                                              Florida Bar No. 176222
                                                             E-Mail:  coulsond@gtlaw.com
                                                              Monica J. Chaplin
                                                              Florida Bar No. 055531
                                                              E-Mail:  chaplinm@gtlaw.com


                                                              ***Counsel for Defendants***

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2011, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on the counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Norman S. Segall, Esq.
Melissa Alagna, Esq.
Sundeep K. Mullick
SEGALL GORDICH P.A.
801 Brickell Avenue, Suite 900
Miami, Florida 33131

Stephen L. Wright
Taylor English Duma, LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339

/s/ David A. Coulson
DAVID A. COULSON