IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **RICHARD I. FRIED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | Civil Action No. |
| | ) | 11-CV-20853-CV-KING |
| **STIEFEL LABORATORIES, INC.,** a | ) | |
| Delaware corporation, **CHARLES W.** | ) | |
| **STIEFEL, BRENT D. STIEFEL, TODD** | ) | |
| **STIEFEL, STEPHEN KARASICK,** | ) | |
| **MICHAEL CORNELIUS, and MATT S.** | ) | |
| **PATTULLO,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF RICHARD I. FRIED'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
DEFENDANTS STIEFEL LABORATORIES INC. AND CHARLES W. STIEFEL
AND MEMORANDUM OF LAW IN SUPPORT**

Plaintiff Richard I. Fried ("Fried"), pursuant to Federal Rule of Civil Procedure 56(a) and S.D. Fla. L.R. 56.1, moves for partial summary judgment against Defendants Stiefel Laboratories Inc. ("SLI" or the "Company") and Charles Stiefel ("Stiefel" or "Charles") on the basis of undisputed material evidence as to Count III of his Amended Complaint (Fraud in Violation of Section 10(b), 20(a) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5) in terms of entitlement to recover damages as to Fried's shares held in an SLI-sponsored plan under ERISA.[1] Determination of damages would remain for trial. Alternatively, summary judgment should enter  In support of its Motion, Mr. Fried relies upon the accompanying exhibits and his Statement of Undisputed Fact ("SOF"), including its accompanying exhibits, and states as follows:

## I. INTRODUCTION

This action is one of several pending in this District arising from the sale of SLI to GlaxoSmithKline ("GSK") in April 2009. One such action, *Finnerty v. Stiefel Laboratories,*

---

[1] Fried also held shares of SLI stock separate and apart from the ERISA plan, the sale of which also forms part of Count III of his Amended Complaint. Fried does not seek summary judgment herein as to Count III.

*Inc., et al.*, Case No. 09-21871-CIV-KING/McAliley, proceeded to trial in May 2012, and resulted in a verdict in favor of the plaintiff, Timothy Finnerty, against SLI and Charles on Mr. Finnerty's securities fraud claim. SOF ¶ 38. In that case, Mr. Finnerty, a former SLI employee, proved that SLI and Charles violated Rule 10b-5 by failing to disclose material information pertinent to the value of SLI's common stock including, among other things, information regarding SLI's merger negotiations and plans to sell itself when he sold his stock back to the company in early 2009. The jury awarded Mr. Finnerty $1,502,484.90 in damages, which represented the difference in the price per share that GSK paid for the company ($69,705) and the price Mr. Finnerty received ($16,469) multiplied by the number of shares he owned as part of SLI's Employee Stock Bonus Plan ("ESBP"). SOF ¶ 38.

Mr. Fried's case, in many respects, is no different than Mr. Finnerty's. Mr. Fried, like Mr. Finnerty, was a former SLI employee who accumulated SLI stock under the ESBP, and SLI purchased Mr. Fried's stock from him in early 2009 without disclosing the full material information concerning the value of its stock, including its merger negotiations and plans to sell itself. Mr. Fried's case differs, however, in that he also had a long friendship with Charles over 20 years, starting with Mr. Fried's service as SLI's chief financial officer through 1997, during which Mr. Fried received information from Charles upon which he relied in deciding to sell his ESBP stock in January 2009. In other words, not only are all of the relevant facts and evidence in *Finnerty* regarding Defendants' statements and conduct also found in Mr. Fried's case, Mr. Fried has an entire set of additional facts and evidence strengthening his entitlement to relief.

Summary judgment should enter in Mr. Fried's favor on entitlement to relief for his Rule 10b-5 securities fraud claim in Count III of the Amended Complaint. The undisputed evidence should result in the entry of judgment as to all elements of securities fraud save for quantification of damages. Alternatively, Mr. Fried is entitled to partial summary judgment regarding at least the scienter and materiality elements of his securities fraud claim by application of offensive issue preclusion/collateral estoppel. These elements were necessary to the judgment in *Finnerty* and were resolutely but unsuccessfully defended by SLI and Charles before a jury based on evidence common to both cases.

## II. BACKGROUND

Defendant SLI is a pharmaceutical company founded in 1847 that specialized in dermatological products. SOF ¶ 1. It had been privately held, owned in large part by the Stiefel

{00316997.DOCX / }

family, for its entire 160-year history, until it merged with GlaxoSmithKline ("Glaxo") in 2009. SOF ¶ 2.  Before the merger, SLI repeatedly represented to its employees, including Mr. Fried, that it prided itself on being a privately-held company and intended to remain so.  SOF ¶ 3.

Mr. Fried began working for SLI in 1987 as the company's Chief Financial Officer.  SOF ¶ 4.  Mr. Fried was interviewed by and recommended for the position by Charles, who became SLI's Chief Executive Officer and is an attorney admitted to practice in New York.  SOF ¶ 5. Mr. Fried is an accountant but is not an investment analyst or consultant.  SOF ¶ 4.

At the time he worked at SLI's offices in Coral Gables, Florida, his office neighbored Charles' office and that of Charles' father, Werner Stiefel.  SOF ¶ 6.  Charles and Mr. Fried interacted, in Charles' words, "a lot," and thought so highly of Mr. Fried's work that he advocated his father to grant Mr. Fried "phantom stock" in SLI in addition to any other benefit.[2] SOF ¶ 6, 8.  Charles and his spouse and Mr. Fried and his wife socialized frequently outside of work even after Mr. Fried separated from SLI in 1997.  SOF ¶ 7, 9-10.  Charles today still regards Mr. Fried as a friend and recognized in an email in 2009 that they had a "long friendship."  SOF ¶ 7.  While an employee of SLI, Mr. Fried acquired 10.0 shares of SLI common stock outside the ESBP[3] and 30.7881 shares as part of the ESBP.  SOF ¶ 13.  Mr. Fried's ESBP shares were purchased by SLI as of January 30, 2009.  SOF ¶ 34.

At the same time that Mr. Fried and other current and former employees were selling their shares to the company, Defendants decided to sell the company and took numerous steps to that end, including deciding on a base price of $60,000 per share of common stock, hiring investment bankers and entering into negotiations with a potential acquirer.  SOF ¶ 21-31. Defendants *never* disclosed these events to Mr. Fried before he sold his shares to the company. SOF ¶ 20, 35.

In late September 2008, SLI director Anjan Mukherjee was in communication with a representative of international pharmaceutical company Sanofi Aventis regarding an "update" concerning SLI.  SOF ¶ 21.  In early November 2008, the CEO of Sanofi-Aventis expressed an

---

[2] The phantom stock granted Mr. Fried does not form a part of his claims in this action. The grants of phantom stock never vested and Mr. Fried never benefited from them.

[3] Mr. Fried's non-ESBP shares were purchased by SLI in March 2008 for a price equal to the valuation at March 31, 2008 of $14,517 per share less a ten percent discount for a final per share price of of $13,065.  SOF ¶ 18.

{00316997.DOCX / }

interest in acquiring SLI to Mr. Mukherjee, who was also a Blackstone executive, relayed this interest to Charles, SLI's CEO at the time.[4]  SOF ¶ 21.

Charles discussed "the concept of selling the company," which had been "taboo in the past," with his two sons, Brent and Todd, at their annual family meeting on November 26, 2008. SOF ¶ 22.  Their family meeting also doubled as an SLI compensation committee meeting, during which they agreed to offer certain high-ranking executives, including themselves, employment contracts for the first time in the company's history.  *Id*.

That same day, Charles sent Mukherjee an email asking him several questions, including what he thought about the idea of selling the company, what price he thought an acquirer would pay, and how they should proceed if they decided to sell.  SOF ¶ 23.  Mukherjee and another Blackstone executive, Mr. Chinh Chu, called Stiefel almost immediately.  *Id*.  They told Charles that the decision whether to sell was a "binary one," i.e. that SLI should sell itself either immediately or in five years, and that "it is possible we could get someone to pay 3-5 times sales . . . a high price is quite possible, and they think we could get a deal done," and that the price Blackstone paid per share when it invested in SLI (approximately $60,000 per share) "will serve as a floor."  *Id*.  As SLI's sales were approximately $900 million at the time, 3-5 times sales would have been approximately $2.7 billion to $4.5 billion.  *Id*.

When Charles shared this information with his two sons, Brent responded, "I vote we move on this right now as 5 years poses a fair amount of risk," and Todd responded, "I agree with [Brent].  Let's start moving."  SOF ¶ 24.  Following their decision to "start moving" on the sale of the company, the three Stiefels met with Blackstone's mergers and acquisitions advisory group on December 8, 2008.  *Id*.  During the meeting, Blackstone presented a "timeline and work plan" predicting that a merger could be announced in March 2009, identified several "tier-one" acquirers, including Sanofi-Aventis and Glaxo, and presented a "valuation matrix" predicting that "[b]uyers will likely place more emphasis on Stiefel's revenue potential" and showing the prices SLI would receive if acquirers valued the company at 2.5 times to 4.5 times revenue.  SOF ¶ 25.  Later that day, Mukherjee sent Brent an email reiterating that he believed that the company

---

[4] Blackstone Healthcare Partners, LLC ("Blackstone"), one of the Blackstone private equity companies, on August, 10, 2007, purchased preferred stock of SLI for $500,000,000 at price of $60,000 per share and which was convertible to common stock at a one-to-one ratio.  SOF ¶ 14-15.  One right Blackstone received was that of designating a director to SLI's board of directors, which position Mr. Mukherjee took in the summer of 2008.  *Id*.

could sell for "at least $3 billion." *Id*. Additionally, Charles sent Mukherjee an email asking how much money shareholders would receive if the company sold for $3 billion, given the company's debt, and Mukherjee responded that shareholders would receive approximately $2.6 billion. SOF ¶ 26.

Earlier, on October 3, 2008, Mr. Fried met Charles at his office for an "unofficial" meeting at which Charles later testified that he shared "all the information that [he] had" including sales and profit data. SOF ¶ 20. During the meeting, Charles emailed Mr. Fried a draft copy of the valuation report for the stock price as at March 31, 2008, even though it had not yet been made available to ESBP participants. SOF ¶ 11, 20. While Charles failed to state anything regarding Sanofi-Aventis or plans to sell SLI, he did tell Mr. Fried that the future looked "challenging" and that the share price for SLI stock would likely decline. SOF ¶ 20. Mr. Fried understood Charles to be giving a "sell signal" for his ESBP stock. *Id*. Mr. Fried thereafter emailed Charles regarding his intent to take a distribution of his ESBP stock, and also suggesting that they gather for a New Year celebration. SOF ¶ 29. Charles replied on December 17, 2008 declining the invitation to socialize, but failing to mention that a meeting had been arranged with Sanofi-Aventis for December 22, 2008 to discuss the possible sale of SLI. *Id*.

After the email exchange with Mr. Fried, on December 22, 2008, Charles met with the CEO of Sanofi-Aventis, several Blackstone employees, and at least one investment banker retained by Sanofi-Aventis. SOF ¶ 27. One of the Blackstone employees noticed that Sanofi's investment banker "had worked up a detailed valuation of SLI," which he viewed "as a sign that they were very serious." *Id*. At the meeting, Sanofi's CEO discussed how he envisioned SLI operating within Sanofi, and requested that the companies sign a confidentiality agreement and set up additional meetings. *Id*. Charles agreed to "mov[e] forward" with potentially selling the company to Sanofi. SOF ¶ 28. Following the meeting, Charles wrote the following to his sons: "I am excited to move forward." *Id*.

Approximately a week later, in late December 2008, SLI signed an engagement agreement with Blackstone's mergers and acquisitions advisory group. SOF ¶ 30. Under the agreement, Blackstone agreed to assist SLI in "analyzing, structuring, negotiating, and effecting the Transaction," which was defined to include "the sale, transfer, or other disposition, directly or indirectly, of all or a significant portion of the business, assets, or securities of [SLI]." *Id*.

After considering his October 2008 conversation with Charles, the information he

{00316997.DOCX / }

received then, and the "sell signal" he received from Charles at that time, Mr. Fried decided to sell his 30.7881 ESBP shares. SOF ¶ 20, 33. Upon Mr. Fried's request, SLI distributed his ESBP shares on January 6, 2009 which were then purchased by SLI under cover of a letter dated January 30, 2009 based on the March 31, 2008 valuation of SLI for a resulting per share price of $16,469. SOF ¶ 32, 34. The proceeds of the sale were to be paid one-fifth in cash with the balance paid over four years under a promissory note SLI sent with the January 30th letter providing for interest at 3.25% per year instead of the 7.25% represented to Mr. Fried before he decided to sell his shares. SOF ¶ 33, 34. Between the October 3, 2008 meeting with Charles and January 30, 2009, Mr. Fried received no further substantive financial information or information regarding the SLI sale process from Charles or any of the other Defendants. SOF ¶ 20, 34.

During January-April 2009, Blackstone assisted SLI in entering into confidentiality agreements with potential acquirers, preparing presentations for potential acquirers, and soliciting bids from potential acquires. SOF ¶ 31. On March 24, 2009, Sanofi-Aventis formally submitted a bid for SLI valuing it at $3.2 billion, and Glaxo formally submitted a bid valuing it at $3.5 billion. SOF ¶ 35. On April 20, 2009, SLI reached an agreement with Glaxo to sell itself for approximately $3.6 billion, which is consistent with the price that Blackstone predicted it could obtain in November 2008. SOF ¶ 36. The agreement valued each share at $68,515.29, and provided that shareholders could receive an additional $7,186.91 per share if certain contingencies occurred. *Id*. Defendants have stipulated that those who owned SLI shares when the merger closed have received $69,705 per share thus far. *Id.* None of the executives who received employment contracts or learned about the merger negotiations sold their stock when given the opportunity to do so in January and February 2009. SOF ¶ 37.

The Finnerty case was tried on the basis of Count 4 of plaintiff's Second Amended Complaint, alleging Section 10(b) and Rule 10b-5 of the Exchange Act, over the course of May 7 to May 16, 2012, and resulted in a jury verdict in favor of plaintiff. SOF ¶ 38. Final judgment entered against Charles and SLI on July 10, 2012. *Id.*

### III. SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted if the "movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Rules of Civil Procedure also permit the entry of partial summary

{00316997.DOCX / }

judgment, which accelerates litigation "by framing and narrowing the triable issues, and by eliminating, before trial, matters that contain no genuine issue of material fact." *Antenor v. D & S Farms*, 866 F. Supp. 1389, 1396 (S.D. Fla. 1994), *reversed on other grounds*, 88 F.3d 925 (11th Cir. 1999); *see also, Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 280 (11th Cir. 2007) (holding that partial summary judgment on collateral estoppel grounds was warranted).

In a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202.

## IV. ARGUMENT

### THE COURT SHOULD GRANT MR. FRIED SUMMARY JUDGMENT AS TO ENTITLEMENT TO DAMAGES UNDER COUNT III (RULE 10b-5 SECURITIES FRAUD) AS TO HIS ESBP SHARES

Plaintiff Fried asserts in Count III of his Amended Complaint a claim for securities fraud claim under §10(b) and Rule 10b–5 of the Exchange Act.  To recover under such a claim, "a plaintiff must establish the following elements: '(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss.'" *Finnerty v. Stiefel Labs., Inc.*, 677 F.Supp.2d 1331, 1342 (S.D. Fla. 2010) (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir.2008)).

Fried moves this Court for partial summary judgment as to securities fraud on two alternative bases.  First, summary judgment should enter on the basis of the undisputed material

{00316997.DOCX / }

fact of this case as to the matter of entitlement to relief for securities fraud, leaving determination of damages for trial. In the alternative, based on the final judgment in *Finnerty*, Defendants should be collaterally estopped or precluded from re-litigating the first two elements—materiality and scienter—as to Mr. Fried's securities fraud claim.

### A.  THE UNDISPUTED EVIDENCE SHOWS SUMMARY JUDGMENT SHOULD BE ENTERED AS TO ENTITLEMENT TO RELIEF.

The undisputed material facts of this case show that summary judgment should enter against Defendants Charles and SLI as to the elements of (1) a material misrepresentation or omission as to the value of SLI stock; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; and (5) causation. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-1237 (11th Cir. 2008); *Finnerty,* 677 F.Supp.2d at 1342.

### 1.  Defendants Stiefel and SLI Omitted Disclosure of Material Information

In terms of determining materiality of a factual omission, the Eleventh Circuit articulated the standard as: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012), *quoting, TSC Indus. v. Northway*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132 (1976).

Undisputed in this case is that Mr. Fried's 30.7881 ESBP shares were purchased by SLI with purchase confirmation, partial proceeds and a promissory note transmitted by SLI on January 30, 2009 at a price of $16,469.00 per share. SOF ¶ 32-34. SLI stated and represented to Mr. Fried as with all other shareholders of SLI common stock, as shown in *Finnerty*, that such shares were correctly valued at $16,469 per share as at March 31, 2008. SOF ¶ 20, 32-34. Additionally, on October 3, 2008, Mr. Fried had a meeting with Charles at his offices in Coral Gables, Florida at which Charles emailed Mr. Fried, a draft copy of the stock valuation report upon which the sales price was later based even before that price was available to other ESBP shareholders. SOF ¶ 11, 20. Charles also shared with Mr. Fried a copy of SLI's financial statements and sales and profit data, i.e. "everything that I had," as Charles later testified. SOF ¶ 20. Charles further informed Mr. Fried that SLI's future was "challenging" and that he foresaw a decline in SLI's stock valuation and, thus, the share price. *Id.*

The October 3, 2008 meeting between Charles and Mr. Fried was similar to a meeting they had on September 17, 2007 where Charles also provided information relating to SLI stock.

SOF ¶ 16-17. Mr. Fried expressed to Charles before this meeting that he was considering a sale of his non-ESBP stock and that he was looking for an "off the record" meeting for financial information to include in considering the sale. SOF ¶ 17. Charles shared the requested financial information with Mr. Fried and the two also discussed in some detail the terms of the recent stock purchase by Blackstone. SOF ¶ 16-17. A few months later, Mr. Fried sold his non-ESBP shares back to SLI. SOF ¶ 18.

SLI director Mr. Mukherjee had initial communications with representatives of potential acquirer Sanofi-Aventis in late September 2008. SOF ¶ 21. There followed the family meeting on November 26, 2008 and subsequent correspondence where Charles and his sons decided to go forward with the sales process and set a $60,000 per share price for common stock as a floor. SOF ¶ 22-24. A meeting with Sanofi-Aventis to discuss the possible sale of SLI, attended by Charles, occurred on December 22, 2008, followed closely by execution of a formal engagement agreement with Blackstone to represent SLI in the sales process. SOF ¶ 25-28, 30. Between December 15-17, 2008, Charles engaged in an email dialogue with Mr. Fried wherein the latter advised Charles of his decision to soon take a distribution of his ESBP stock. SOF ¶ 29. Charles' response was entirely devoid of any information to indicate that the financial and stock valuation information he shared with Mr. Fried during their October 3rd meeting was no longer accurate. SOF ¶ 28.

The material information Charles, and thus SLI, failed to disclose was not so much specific information about the rapidly accelerating process for the sale of SLI, but that the statement of share price information distributed among shareholders as well as the information shared with Mr. Fried regarding the stock valuation was outdated or misleadingly incomplete. Rather than SLI being in a negative and "challenging" situation such that Charles expected the stock valuation to fall from its then-current one of $16,649, SLI's financial position was actually substantially stronger such that Charles, his sons and Mukherjee could confidently establish a "floor" price of $60,000 per share (that being the very same per share conversion price for Blackstone's preferred shares). SOF ¶ 15, 23. Yet Charles was completely silent with Mr. Fried and did absolutely nothing to correct his misapprehension through the date SLI purchased his stock on January 30, 2009, by which time the sale process had well progressed. Any reasonable investor would have found any information indicating that earlier financial and stock valuation information was no longer accurate as highly material to a decision to sell their stock.

This Court has already held on a subset of the identical facts herein involving the same Defendants that omission of information regarding the efforts to sell SLI were material to ESBP shareholders in order to make the statement of the share price as at March 31, 2008 not misleading:

> A reasonable stockholder . . . , would have wanted to know that [SLI] was in merger discussions because of the significant possibility that the value of the shares was actually much higher than was reported. Such a stockholder would almost certainly reconsider exercising the 'put' option because of the fact that the stock would be worth much more in less than a year's time. The magnitude of such an event is great, as [SLI] had remained family controlled for such a long time and the premium available to the shareholders was nearly five times greater than the current stock price. . . . As discussed above, however, the Company created a duty to disclose when it reported an under-valued stock price and gave Plaintiffs a one-time offer to sell their shares back to the Company at that price. At that point, the merger discussions became material.

*Bacon v. Stiefel Laboratories, Inc.*, 677 F. Supp. 2d 1331, 1345 (S.D. Fla. 2010); *see, Basic Inc. v. Levinson*, 485 U.S. 224, 231-232, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).

### 2. Defendants Charles and SLI Had The Requisite Scienter.

The element of scienter in a securities fraud case can be established by evidence of intent to deceive or of recklessness, whereby the latter is understood to require, ". . . more than simple, or even inexcusable negligence. It requires 'an extreme departure from the standards of ordinary care, … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Huddleston v. Herman & MacLean*, 640 F.2d 534, 545 (5th Cir. 1981), *quoting*, *SEC v. Southwest Coal & Energy Co.,* 624 F.2d 1312, 1321 n.17 (5th Cir. 1980).

Undisputed evidence in this case suffices to show that the requisite level of recklessness, and perhaps even outright intent to defraud, existed. Charles was very aware from his "long friendship" with Mr. Fried, their numerous conversations over the course of more than two decades including their two most recent face-to-face meetings on September 17, 2007 and October 3, 2008 that Mr. Fried looked to him for – and was freely given by Charles – information and advice on the financial performance of SLI and its stock valuation in considering disposition of his ESBP stock. SOF ¶ 4-10, 16-17, 20. Charles admits that in terms of financial information about SLI, Mr. Fried would only learn, "just what I would tell him." SOF ¶ 11.

In mid-December Mr. Fried exchanged emails with Charles regarding Mr. Fried's consideration of taking a distribution of his ESBP shares and getting together socially for New Years. SOF ¶ 29. Unbeknownst to Mr. Fried, Charles had by this time already helped launch the process of selling SLI and was just a few days from a previously arranged meeting with potential acquirer Sanofi-Aventis on December 22, 2008. SOF ¶ 27-29. Even though Charles had actual knowledge or, as CEO and former trustee of the ESBP, constructive knowledge that there were just two sixty day periods in which Mr. Fried would have the right to sell his shares to SLI after taking a distribution of them, and even though he was in the very center of the rapidly accelerating sales process for SLI, Charles was entirely silent about the fact that the information he gave Mr. Fried at the October 3, 2008 meeting was no longer accurate. SOF ¶ 29, 34. Charles' failure to give any update to the October 3rd meeting or to even give a slight indication that the stock's valuation was potentially other than what Charles had informed Mr. Fried, was almost certainly intentional and in any event an extreme departure from the applicable standard of care and created a clear danger of misleading Mr. Fried so obvious that Charles must have been aware of it.

### 3. The Undisputed Evidence Shows That The Material Omission Occurred In Connection with the Sale of a Security.

In Rule 10b-5 actions, the "'in connection with' clause has been interpreted 'flexibly.'" *SEC v. Adler*, 137 F.3d 1325, 1344, n 24 (11th Cir. 1998), *quoting, United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993).

Undisputed in this case is that Mr. Fried "put" his shares to SLI in January 2009 which were purchased by SLI as of January 30, 2009. SOF ¶ 34. The purchase of the shares was the culmination of an interconnected series of events starting with the October 3, 2008 meeting between Mr. Fried and Charles when the latter provided SLI financial information and expressed such doubt about SLI's future as to give Mr. Fried a clear "sell signal." SOF ¶ 20. Between the meeting and the sale, was the exchange of emails between the two on December 15-17, 2008 in which Mr. Fried confided in Charles his thought of taking a distribution of his ESBP stock. SOF ¶ 29. As stated more than once above, Charles' communications entirely omitted any information or even hint that what he had related to Mr. Fried the preceding October was in any way inaccurate or to dissuade Mr. Fried that SLI's fortunes were not continuing to deteriorate as

they had through October.  *Id.*  Charles' omission of such material information connects directly to Mr. Fried's put of his shares SLI just a few weeks after their email exchange.  SOF ¶ 34.

### 4. Mr. Fried's Reliance On The Omission of Material Information Is Both Presumed As A Matter Of Law And Established By The Undisputed Facts,

#### a. Charles' and SLI's Omission of Material Information Gives Rise to the Presumption of Mr. Fried's Reliance

For Rule 10b-5 securities fraud claims, "[w]here there is a complete omission of a material fact, a rebuttable presumption of reliance arises," to the extent a duty to disclose exists.  *BCJJ, LLC v. Lefevre*, 2011 U.S. Dist. LEXIS 71479, 72-73 (M.D. Fla. June 30, 2011), *citing*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 128 S. Ct. 761 (2008); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). "This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Affiliated Ute*, 406 U.S. at 154; *Bruhl v. Price WaterhouseCoopers Int'l*, 257 F.R.D. 684, 692, 2008 U.S. Dist. LEXIS 83970 (S.D. Fla. 2008).

Mr. Fried's claim, as explained in the preceding sections above and in his Amended Complaint, asserts the omission of material information by Charles in connection with Mr. Fried's sale of his ESBP shares to SLI in January 2009.  Charles and SLI had a duty to disclose such material information which they failed to do, thus Mr. Fried's reliance is presumed and thereby establishes causation.  *Affiliated Ute*, 406 U.S. at 154.

#### i. Charles' Previous Statements Gave Rise to a Duty to Disclose.

The duty to disclose can arise from the defendant having made a prior statement or from the nature of the parties' relationship. *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1206 (11th Cir. 2001).  In the present context, "[a] duty to disclose may . . . be created by a defendant's previous decision to speak voluntarily." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986).  "[W]here a defendant does make voluntary statements, it must speak completely to avoid 'half-truths.'" *Bacon,* 677 F. Supp. 2d at 1343.  A statement is misleading if in the light of the facts a reasonable investor, in the exercise of due care, would have been misled by it.  *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1298-1299 (11th Cir. 2011), *quoting*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007).

From the preceding sections, the undisputed evidence shows that at the October 3, 2008 meeting, Charles provided Mr. Fried with substantial information regarding the financial

performance, sales and profit of SLI and regarding its stock valuation. SOF ¶ 20. This information included sending an email to Mr. Fried during of the draft stock valuation report for the most recent annual valuation. SOF ¶ 11, 20. Charles gave a grim prognostication about SLI's future and told Mr. Fried that SLI's stock valuation would likely decline. SOF ¶ 20. Later, when Charles and Mr. Fried communicated in mid-December regarding Mr. Fried's possible distribution of his ESBP stock, Charles' email was silent even though he, as CEO, was at the center of the sales process, had established a base sale valuation for common stock at more than 3.6 times the valuation he had represented to Mr. Fried, and would meet a few days later with potential acquirer Sanofi-Aventis.[5] SOF ¶ 29. A reasonable investor in Mr. Fried's position would have been misled by Charles' omission to update or correct his earlier statements, thus giving rise to a duty to disclose.

### ii. Charles' Relationship with Mr. Fried Gave Rise to a Duty to Disclose.

The duty to disclose also arises in this case from the relationship between Charles and Mr. Fried out of both the corporate insider – minority shareholder status and the personal relationship of trust and confidence that existed. A duty to disclose arises out of "a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation . . . because of the necessity of preventing a corporate insider from taking unfair advantage of the uninformed minority stockholders." *Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108, 1114-1115, 63 L. Ed. 2d 348 (1980), *quoting, Speed v. Transamerica Corp.,* 99 F.Supp. 808, 829 (Del. 1951)(involving a Rule 10b-5 claim against a Delaware corporation). Other relationships can also give rise to a duty to disclose: "Some of the factors that we consider in determining whether a duty to disclose exists include the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decision, and defendant's role in initiating the purchase or sale." *Ziemba v. Cascade Int'l, Inc*., 256 F.3d 1194, 1206 (11th Cir. 2001).

---

[5] The reference is to the meeting with Sanofi-Aventis' CEO on December 22, 2008, after which Sanofi-Aventis went on to make one of two formal bids for SLI on March 24, 2009. SOF ¶ 35.

{00316997.DOCX / }

In this case, the undisputed evidence shows that not only did there exist a relationship between a minority shareholder and corporate insider Charles, CEO of SLI, but also that a relationship of trust and confidence arose out of the "long friendship," as Charles described it. SOF ¶ 5, 7.  By the time of the events at issue, Charles and Mr. Fried had been friends for over 20 years, had worked closely together as SLI officers, and continued to stay in touch for over ten years after Mr. Fried's departure from SLI about, among other things, SLI's performance and stock valuation culminating in the September 2007 and October 2008 meetings.  SOF ¶ 9-11, 16-20.

Charles knew from his interactions with Mr. Fried that the latter looked to Charles for information regarding SLI's performance and stock valuation that Mr. Fried would rely upon in making decisions regarding his SLI stock.  SOF ¶ 16-17, 19-20.  Charles gave Mr. Fried, in Charles' words, "all the information I had" while at the same time being cognizant that Mr. Fried's access to information about SLI was "just what I would tell him."  SOF ¶ 11, 20.  Charles was also cognizant that he would benefit from reductions in the number of outstanding shares as it would increase the value of his holding and amount received in the sale of SLI.  SOF ¶ 31.  These factors combine to show that there was, as a fact, a relationship of trust and confidence between Charles and Mr. Fried.  This relationship gave rise to Charles' duty to disclose material information to Mr. Fried.

### b. Mr. Fried Actually Relied Upon the Omission of Material Fact.

Even were there to be no presumption of reliance, the undisputed evidence shows that Mr. Fried in fact relied on the omission of material information in deciding to sell his ESBP shares to SLI in January 2009.  Undisputed is the fact that between the October 3, 2008 meeting with Charles and the time SLI purchased his shares on January 30, 2009, Mr. Fried received no information from Charles or anyone else at SLI to indicate that the information Charles provided at the meeting was no longer accurate.  SOF ¶ 29, 34.  Indeed, Mr. Fried understood Charles to be giving him a "sell signal."  SOF ¶ 20.  Nor was Mr. Fried given any information to indicate that SLI had embarked on a process that would lead to its eventual sale to Glaxo.  SOF ¶ 34.  Mr. Fried testified under cross-examination that he relied upon the information, and lack thereof, provided by Charles in deciding to sell his shares to SLI.  SOF ¶ 33.  These facts combine to show that there was actual reliance by Mr. Fried on the omission of material information in connection with the sale of his ESBP stock.

5.  **Undisputed Evidence Shows That Fried Suffered Injuries As A Direct and Proximate Result of the Fraudulent Conduct Of Defendants Chares and SLI.**

Although there is dispute as to the quantity of Mr. Fried's injuries experienced as a result of Defendants Charles' and SLI's fraudulent conduct, not disputed is that Mr. Fried suffered an injury of some degree, presuming the other elements for entitlement to relief for securities fraud around found.  The preceding sections of this Argument show that the sale of Mr. Fried's ESBP shares in January 2009 was the direct and proximate result of omissions of material fact by Defendants Charles and SLI.

Undisputed is that Mr. Fried sold his ESBP stock to SLI in January 2009 at the valuation established by SLI as at March 31, 2008 of $16,469 per share.  SOF ¶ 34.  Defendants effectively admit that the valuation used for the purchase of Mr. Fried's stock was erroneous by adopting and tendering as their expert report on valuation the report of Mr. Chester Gougis dated November 16, 2012.  Mr. Gougis' report states that as at March 31, 2008, SLI's common stock held by the ESBP should have been valued at $18,277.  SOF ¶ 39.

Mr. Fried contends that if properly informed he would have held his stock until the sale of SLI to Glaxo and thus should have realized the full Glaxo sale price.  Mr. Fried also contends that Mr. Gougis' report understates the value of SLI stock held in the ESBP.  What is undisputed, however, is that Mr. Fried in fact suffered damage to some extent because all parties agree that the valuation used by SLI to purchase stock in January 2009 was erroneous.

For the foregoing reasons, the Court should enter summary judgment in favor of Mr. Fried as to the issue of entitlement to recover damages on the basis of securities fraud as stated in Count III of his Amended Complaint, thereby leaving the quantification of damages for trial.

B.  **COLLATERAL ESTOPPEL / ISSUE PRECLUSION APPLY AND REQUIRE ENTRY OF PARTIAL SUMMARY JUDGMENT**

In the event this Court should not enter summary judgment as argued in Section A, above, then it should enter summary judgment as to the securities fraud elements of scienter and material omission on the basis of issue preclusion, an application of collateral estoppel.  The doctrine of collateral estoppel "has the dual purpose of protecting litigants from the burden of re-litigating the same issues against the same party or his privy and of promoting judicial economy by preventing needless litigation."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).

To invoke collateral estoppel, a party must demonstrate four elements: "'(1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.'" *In re Air Crash Near Rio Grande Puerto Rico*, No. 11–md–02246, 2012 WL 113774, *3 (S.D. Fla. Jan. 13, 2012) (quoting *CSX Transportation, Inc. v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309, 1317 (11th Cir.2003)).

The currently pending appeal of the jury verdict in the *Finnerty* case does not prevent the application of collateral estoppel now. *SEC v. Blackwell*, 477 F. Supp. 2d 891, 901 (S.D. Ohio 2007). The established rule in federal courts is that a final judgment retains all of its *res judicata* consequences pending decision of the appeal. *Jaffree v. Wallace*, 837 F.2d 1461, 1466-67 (11th Cir. 1988) (*quoting* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4433, at 308 (1981 & Supp.1987).

The elements necessary to invoke issue preclusion are the same whether a party seeks to use it "offensively" or "defensively." *See, Parklane Hosiery Co.*, 439 U.S. at 331 n.16. All four elements are clearly established here. First, the issues at stake in *Finnerty* and this action (in terms of Mr. Fried' ESBP shares) are identical and arise out of the same set of circumstances. Indeed, the relevant allegations in the two complaints are not just similar; they are, almost verbatim, the same in the crucial allegations relating to the securities fraud claim. Compare Mr. Fried's Amended Complaint (SOF ¶ 39, Ex. HH at ¶ 23-47, 49-54, 60, 45-47, 61, 76-78, 103-104, 122-133) with *Finnerty* Second Amended Complaint (SOF ¶ 38, Ex. EE at ¶ 28-57, 61-75, 77, 91, 97-99, 101-104, 109, 156-69). As the references to the *Finnerty* trial record in Plaintiff's Statement of Undisputed Facts demonstrate, the facts regarding Defendants' conduct presented to the jury in *Finnerty* are also alleged in Mr. Fried's complaint.

Second, in rendering a jury verdict against Stiefel and Stiefel Labs, the jury necessarily made legal and factual findings relating to the Defendants' conduct including specific findings on the materiality of Defendants' omissions and Defendants' scienter. In particular, the verdict form specifically asked the jury if they found, by a preponderance of the evidence, Charles' and SLI's conduct in connection with Finnerty's sale of his company stock to SLI violated Rule 10b-

5 of the Exchange Act. The jury specifically found that these elements were satisfied in answering "yes" on the verdict form to both of the following questions:

> Do you find from a preponderance of the evidence?:
>
> > 1. That the Defendant's conduct in connection with Plaintiff's sale of his stock to Stiefel Labs violated Rule 10b-5(b) by making a false representation of a material fact, or omitting a material fact (as explained in the Court's instructions)?
> >
> > 2. That the Defendant acted "knowingly" (as that term is defined in the Court's instructions)?

SOF ¶ 38.

Additionally, *Finnerty* and the instant case both involve the identical statement that gave rise to a duty to disclose, namely the statement of the price of SLI common stock held in the ESBP as at March 31, 2008:

> Thus, the Company's statement of reporting the stock price created a duty to disclose any information that would make that statement not misleading. In this case, the price of the stock, by itself, was misleading because [SLI] knew that the merger would have likely increased the price of the stock, making the reported price incorrect.

*Bacon*, 677 F. Supp. 2d at 1343; SOF ¶ 32-34.

Third, the determination of the materiality of Defendants' omissions and Defendants' scienter were critical and necessary parts of the judgment in *Finnerty* because both issues are explicit elements of a securities fraud claim. Moreover, this Court has already once found that the facts at issue relating to the process of selling SLI were material to the decision to sell ESBP stock. *Bacon,* 677 F. Supp. at 1345.

Fourth, and finally, Defendants had a full and fair opportunity to litigate the issues and, in fact, presented copious evidence and argument during the course of the seven-day trial represented by the same counsel representing Defendants in the instant action. *Id*.

Courts routinely apply collateral estoppel in securities fraud cases like this one. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, --- F. Supp. 2d ---, 2012 U.S. Dist. LEXIS 113706, 2012 WL 3264382, *2 (S.D.N.Y. Aug. 10, 2012) (giving collateral estoppel effect to class action securities fraud verdict with respect to falsity, materiality, and scienter elements in subsequent securities fraud action); *S.E.C. v. Resnick*, 604 F. Supp. 2d 773 (giving collateral estoppel effect to criminal conviction for securities fraud in subsequent civil action for securities fraud); *In re Adelphia Comm. Corp.*, No. 03-MD-1529, 2006 WL 2463355, *6-*8 (S.D.N.Y. Aug. 23, 2006) (granting plaintiffs summary judgment on materiality and scienter elements of securities fraud

claim based on a prior criminal conviction for securities fraud); *Parklane Hosiery*, 439 U.S. at 331-32 (affirming the application of collateral estoppel to a civil securities fraud judgment with respect to materiality in a subsequent civil securities fraud action).  Because all the elements of collateral estoppel are satisfied here as well, Defendants should be precluded from re-litigating the materiality and scienter elements of Mr. Fried's securities fraud claim on the basis of the verdict and judgment in the *Finnerty* action.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff summary judgment as to the aspect of entitlement to recover his damages for securities fraud under Count III of his Amended Complaint, thereby leaving the issue of quantification of damages for trial, or alternatively, to grant summary judgment to Plaintiff on the basis of collateral estoppel or issue preclusion as to the securities fraud elements of omission of material information and scienter due to the verdict and judgment in the *Finnerty* case.

Respectfully submitted,

| | |
|---|---|
| SEGALL GORDICH P.A. | TAYLOR ENGLISH DUMA, LLP |
| Co-Counsel for Plaintiff | Co-Counsel for Plaintiff |
| 801 Brickell Ave., Suite 900 | 1600 Parkwood Circle, Suite 400 |
| Miami, Florida 33131 | Atlanta, Georgia 30339 |
| (305) 755-4930; Fax: (305) 438-7438 | (770) 434-6868; Fax. (770) 434-7376 |
| | |
| /s/ Norman S. Segall | /s/ Stephen L. Wright |
| NORMAN S. SEGALL | STEPHEN L. WRIGHT |
| nss@segallgordich.com | swright@taylorenglish.com |
| Florida Bar No. 158302 | Ga. Bar No. 778747 |
| | *Admitted Pro Hac Vice* |

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 15, 2013, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on the counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF to: Hilarie Bass, David A. Coulson, Lindsey Camp Edelmann, GREENBERG TRAURIG, P.A., 333 Avenue of the Americas, Miami, Florida 33131 and Todd D. Wozniak, 3290 Northside Parkway, Suite 400, Atlanta, Georgia 30327.

                                      /s/ Norman S. Segall
                                      NORMAN S. SEGALL